451 S.E.2d 731

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Thomas Russell Leroy DERR, Defendant Below, Appellant.**

**No. 22101.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 14, 1994.

Decided Nov. 18, 1994.

Shawn A. Taylor, Asst. Atty. Gen., Charleston, for appellee.

David L. Zehnder, Public Defender Corp., Moundsville, for appellant.

CLECKLEY, Justice:

The defendant, Thomas Russell Leroy Derr, appeals from a final order of the Circuit Court of Marshall County, dated May 6, 1993, sentencing him to life without mercy for first degree murder, to not less than two nor more than ten years for malicious assault, and to two sentences of not less than fifteen nor more than twenty-five years for two counts of first degree sexual assault. All of the sentences were ordered to run consecutive to each other.

On appeal, the defendant asserts that the trial court erred: (1) by denying his request for a change of venue; (2) by failing to individually voir dire jurors who showed potential bias and prejudice; (3) by permitting

the State to introduce as evidence two photographs of the deceased victim; (4) by refusing to give certain jury instructions offered by the defendant; (5) by failing to admonish the jury prior to several recesses; (6) by allowing Fred Zain to testify concerning DNA tests performed by another person; (7) by permitting the State to pose a hypothetical question to a state trooper; (8) by denying the defendant's motion for a continuance to obtain his own DNA expert; and (9) by allowing cumulative errors to occur at trial. After reviewing these errors and the facts of this case, we do not find that any of these alleged errors warrant reversal of the defendant's convictions.

## I.

### FACTS

In the early evening of December 1, 1990, Connie S. and Dana L.,[1] both fifteen-year-olds, were walking to a Super X in the Wheeling area when the defendant asked the girls if they needed a ride. It was dusk, and the defendant and four other young men were stuck in traffic near Oglebay Park during the Festival of Lights. The girls accepted the defendant's offer and got into the car. The defendant then did a U-turn to get out of the stopped traffic. Dana testified that when they accepted the ride she and Connie did not recognize any of the men; however, once they were in the car, she realized that she was acquainted vaguely with Robert N., a juvenile, commonly referred to as Bobby.

During the course of the evening, three of the young men were dropped off at their houses leaving the defendant, Bobby, Connie, and Dana remaining in the car. These four drove all over the area and were drinking beer. Dana said at first the four were having a good time. Dana testified that she and Connie did not drink much and were not drunk. On the other hand, both the defendant and Bobby admitted at trial that they consumed a considerable amount of alcohol.

Both Dana and Bobby testified that at some point Bobby passed out in the back seat of the car. After Bobby passed out, Dana claimed the defendant, who was driving the car, pulled out a knife and told her to get in the front seat with Connie. Dana complied, and she recalled the defendant threatening her with the knife telling her not to scream or cry and "to shut the hell up." Subsequently, Dana said the defendant forced her and Connie out of the car.

According to Dana, the defendant told her to stand at the back of the car and turn around, and he told Connie to stand at the front of the car. The defendant was at the front of the car with Connie. Dana saw that both Connie's and the defendant's pants were down and he got on top of Connie. Dana did not see whether they had intercourse because the defendant told her to turn around. After he was finished with Connie, Dana testified that the defendant raped her. She said it was not voluntary and the defendant still had the knife in his hand. Dana said she did not attempt to run from the defendant because they were in a rural area and it was dark. She also did not want to leave Connie behind with the defendant.

After he raped her, Dana alleged the defendant forced the girls back into the car, drove a little further, stopped the car, and, with the knife in his hand, told the girls to get back out of the car. Both girls got out of the car, and the defendant forced Connie to perform oral sex on him while Dana was forced to kiss him. The defendant then drove the girls to the Miller Hill Road area.

Dana testified that Connie was crying and they asked the defendant to let them go home. She said the defendant refused because he believed that she would tell her dad or they would call the police. Instead, the defendant stopped the car for a third time, grabbed something behind him, and forced the girls out of the car. The three walked for a while and then the defendant hit the girls on their heads with a baseball bat. Dana could not remember much of this

---

1. In cases that involve sensitive facts, we follow our traditional practice of not using last names to avoid stigmatizing the parties. *See, e.g., State v. George W.H.,* 190 W.Va. 558, 439 S.E.2d 423 (1993); *State ex rel. Div. of Human Serv. by Mary C.M. v. Benjamin P.B.,* 183 W.Va. 220, 395 S.E.2d 220 (1990).

event. However, she believed Bobby remained passed out in the back seat of the car the entire time these crimes were occurring.

Bobby testified there were substantial periods of time that he was passed out or sleeping in the car. He stated that he was unaware of what happened to the girls but he remembers the doors opening and closing when the defendant got back into the car. Afterwards, Bobby said he was awake, and the defendant drove the car back to the defendant's house. Bobby claimed he was "in and out" of it during the night and passed out again in the back seat of the car until morning when the defendant's wife drove him to his house.

The next morning a passerby found Dana wondering along the side of the road. He took her down the road and called 9-1-1. Dana was transported to the hospital and, by all accounts, was not speaking coherently at the hospital. However, she was able to tell one nurse that she and her friend Connie were hit on their heads with a baseball bat.

Dana's treating physician testified that Dana drifted in and out of consciousness and suffered a star-shaped laceration on the back and left side of her head that measured approximately ten inches long at one point. He said that lacerations usually are caused by a blow or a fall. He also discovered a blood clot on the left side of her head and small contusions or bruises on the right side of her brain. Surgery was performed to remove the clot and repair the laceration. Dana remained in intensive care for several days. He estimated it took Dana about three or four days before she was able to recall details of what happened.

Later, on the same day Dana was taken to the hospital, Connie's body was discovered in a field in the Miller Hill Road area. A knife was located about thirty feet from her body. A pathologist testified that Connie died of "a blunt force injury to the head." He said she suffered a fractured skull and several lacerations consistent with being hit by a baseball bat. He also noted dirt between her legs in the groin area.

A sex crime kit was used on each victim. Trooper Jeffrey Bowles of the Criminal Identification Bureau of the West Virginia State Police testified that the tests performed on Dana found sperm. However, the tests performed on Connie did not find any sperm. Trooper Bowles explained there were several factors that could cause a lack of sperm and it did not mean that there was not intercourse. Fred Zain also testified as to other serology tests conducted, but as will be discussed later, the results of these tests are deemed to be invalid and unreliable. *See* Section VII, *infra*.

The defendant testified at trial and admitted that he and Bobby were with the two girls drinking beer and driving around the area. He also said that he had sex with Dana but asserted that he did not force her. Instead, he claimed Dana was "hitting on" him and he told her he did not want to have sex with her. He stated that is "when they said that they would tell my wife."

The defendant admitted to having two baseball bats in the car, but he denied having a knife or hitting Dana. He also denied having sex with Connie. The defendant stated he drank a lot of beer and the last thing he remembered was stopping to get gas, pumping the gas, and getting into the back of the car. He said he did not drive anywhere else until he woke up "at the end of my lane at the fire house[.]" He claimed that when he awoke he got out of the back and into the front of the car. He told Bobby to get over and he drove home. He stated he got home around 4:00 or 4:30 a.m.

Due to the heinous nature of these crimes, this case received extensive pretrial publicity in the local media. Newspaper articles emphasized the brutality of the murder and the assault that befell the victims, the grief of Connie's family, and the shock and fear of the community. Headlines of other articles directly tied the defendant's name to the crimes.

## II.

### VENUE

The defendant first complains that the trial court committed reversible error by denying his request for a change of venue. On December 18, 1990, the defendant filed a

motion for a change of venue pursuant to Rule 21 of the West Virginia Rules of Criminal Procedure,[2] and W.Va.Code, 62–3–13 (1923).[3] The defendant based his motion on three grounds. First, he stated that there was extensive pretrial publicity. Second, he asserted that there was widespread bias and prejudice throughout the county against him. Third, he claimed that the sentiment in the community was so hostile and negatively charged that he could not receive a fair trial.

On March 7, 1991, the trial court heard arguments with regard to the motion for a change of venue. In support of his motion, defense counsel[4] submitted approximately forty affidavits and numerous newspaper articles to demonstrate bias, prejudice, and hostility in the community against him. Defense counsel represented to the trial court that only two people he spoke with in completing the affidavits could not remember the facts of the case or had no opinion with regard to the case. He also asserted that a number of the affidavits indicate the defendant could not receive a fair trial. Defense counsel conceded that the amount of media coverage of the case had died down.

On the other hand, the prosecuting attorney submitted 112 affidavits in opposition to the defendant's motion. We find the statistical data composed from question numbers 12 and 14 especially revealing. Question number 12 asked the respondents if they knew "any reason why Thomas Derr could not receive a fair trial by a jury composed of citizens in Marshall County, West Virginia[.]" Out of the 112 answers, 108 of the answers were no, 3 were yes, and 1 was did not know. Likewise, question number 14 asked the respondents "[b]ased on what you know and have heard, is there a present hostile sentiment against Thomas Derr extending throughout the entire county[.]" The answer by 80 of the respondents was no.

At the conclusion of the hearing, the trial court found there was insufficient evidence under the totality of the circumstances "to show that there presently exists a hostile sentiment against the Defendant throughout this county and that he could not receive a fair trial in this county." Therefore, the trial court denied the defendant's motion. The defendant renewed his motion on the day of trial, August 5, 1991, and the motion again was denied.

 It is well established that to determine whether a change of venue should be granted a defendant must demonstrate good cause at the time the motion is heard or during the voir dire of the jury if the motion is renewed. Appellate courts review rulings on a motion for change of venue, including the specific issue whether the defendant demonstrated good cause, under an abuse of discretion standard. Cases from both this Court and the United States Supreme Court hold that a trial court's finding of jury impartiality is to be overturned only for "manifest error." *Patton v. Yount*, 467 U.S. 1025, 1031–32, 104 S.Ct. 2885, 2889, 81 L.Ed.2d 847, 854 (1984). In making our determination, we consider not only the pretrial showing but also the actual voir dire of the jury to determine whether an abuse of discretion occurred. *See State v. Young*, 173 W.Va. 1, 311 S.E.2d 118 (1983).

 A defendant can establish good cause by showing a current hostile sentiment throughout the entire county. We said in Syllabus Points 1 and 2 of *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978):

"1. To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which

---

2. Rule 21 of the Rules of Criminal Procedure, provides, in part:

 "**Rule 21.** ·**Transfer from the County of Indictment for Trial.** (a) *For Prejudice in the County of Indictment.* The circuit court upon motion of the defendant shall order the proceedings transferred as to him to another county if the circuit court is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at the place fixed by law for holding the trial."

3. W.Va.Code, 62–3–13, states, in relevant part, that "[a] court may, on the petition of the accused and for good cause shown, order the venue of the trial of a criminal case in such court to be removed to some other county."

4. The defendant is represented by different counsel on appeal.

rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' Point 2, Syllabus, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946)."

"2. 'A present hostile sentiment against an accused, extending throughout the entire county in which he is brought to trial, is good cause for removing the case to another county.' Point 2, Syllabus, *State v. Dandy*, 151 W.Va. 547, 153 S.E.2d 507 (1967), *quoting* Point 1, Syllabus, *State v. Siers*, 103 W.Va. 30, 136 S.E. 503 (1927)."

*See State v. Lassiter*, 177 W.Va. 499, 354 S.E.2d 595 (1987); *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983); *State v. Beck*, 167 W.Va. 830, 286 S.E.2d 234 (1981).

As we reiterated in Syllabus Point 1 of *Sette*, the decision to grant or deny a motion for a change of venue rests in the sound discretion of the trial court. Although we find, in the affidavits submitted by the prosecuting attorney, a significant number of respondents either had heard or read about the case, the vast majority believed there was not a hostile sentiment in the county and the defendant could receive a fair trial. Thus, we hold that the affidavits are not sufficient to compel a reversal of the trial court's ruling. As we said in *State v. Beck*, 167 W.Va. 830, 835, 286 S.E.2d 234, 238 (1981), merely "[h]aving some knowledge of the case does not automatically disqualify a juror[.]" (Citation omitted).

As will be discussed in detail later, the voir dire examination does not support the defendant's contention that a change of venue should have been granted. To the contrary, the voir dire in this case failed to indicate any such hostility or partiality against the defendant that could not be laid aside. *See Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

A careful and extensive review of the transcript indicates that although each prospective juror had read or heard about this case in the media, only one juror's response supported a colorable claim of partiality on this basis. This juror responded that she had formed an opinion as to the guilt or innocence of the defendant and had some reservation whether she could lay these feelings aside and decide the case only on the facts and the law. After this juror was questioned at a bench conference, she was dismissed for cause. No other juror expressed a similar predisposition.

■ It can hardly be said that this voir dire examination gave rise to a suggestion or inference of "a community with sentiment so poisoned against [defendant] as to impeach the indifference of jurors who displayed no animus of their own." *Murphy v. Florida*, 421 U.S. at 803, 95 S.Ct. at 2038, 44 L.Ed.2d at 596. In these circumstances, the trial court did not commit manifest error in finding that the jury as a whole was impartial. One of the inquires on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant.

Under this standard, answers to voir dire that merely reveal knowledge about the case would not be sufficient to disqualify those jurors. Neither the statutes nor the West Virginia Constitution require that jurors be totally ignorant of the issues and facts involved. Thus, we are unconvinced that a change of venue was necessary and that the trial court abused its discretion.

### III.

### VOIR DIRE

On August 1, 1991, defense counsel filed two written pretrial motions relating to voir dire. One motion requested permission "to conduct the examination of each individual prospective juror individually and [at an] incamera proceeding." The second motion requested the trial court to ask the panel of prospective jurors 107 voir dire questions that counsel attached to the motion. Jury

selection began on August 5, 1991. On that day, but prior to the start of the jury selection process, defense counsel renewed the motion for *in camera* voir dire, or in the alternative, he requested "that the Court conduct voi dire [sic] with counsel being present and being permitted to individually voi dire [sic] four or five jurors at a time in camera." The trial court denied the motion. The trial court entered the order denying the written motions on August 10, 1991.

During jury selection, the trial court asked the entire panel of prospective jurors whether they either had read or heard about this case in the media. Every member of the panel answered affirmatively. Upon learning this information, the trial court proceeded to ask the entire panel whether they had "formed an opinion as to the guilt or innocence of the Defendant[.]" As mentioned in Section II, *supra,* one prospective juror responded that she had formed an opinion. Subsequently, this juror was questioned at a bench conference and dismissed. The trial court then repeated the question to the remaining panel members asking them whether they had formed an opinion. Although there was no audible response, the trial court concluded that there was apparently no one else.[5]

A new potential juror was impaneled to replace the dismissed one. The trial court asked the new panel member several questions, one of which was whether he knew anything about this case through the media. The juror responded that he had heard about it on the news but that he had not formed an opinion about the defendant's guilt or innocence.

After this response, defense counsel asked the trial court to redirect the same question to the prospective jurors because he believed that someone else had indicated she or he had formed an opinion. Once again, the trial court asked the question whether anyone had formed an opinion based on the media coverage. There was no affirmative response. Nevertheless, the trial court's next four questions focused on this area of concern. The trial court specifically asked the prospective jurors: (1) whether they could disregard what they had heard, read, or discussed and render "a verdict in the trial of this case based solely on the law and evidence"; (2) whether they believed that they could "disregard any information that they've received in the media by reading or hearing or seeing [it] on television"; (3) whether anyone was "conscious of any bias or prejudice either for or against this defendant"; and (4) whether anyone was "conscious of any bias or prejudice either for or against the State of West Virginia in whose name this case is being prosecuted[.]" The record shows that there was no audible response to any of these questions.

The trial court continued to ask a litany of questions of the prospective jurors, and for a fourth time repeated the question as to whether "any member of this panel formed any opinion whatsoever about the guilt or innocence of this defendant, Thomas Russell Leroy Derr[.]" The prospective jurors made no audible response.

At the close of the questioning, the trial court told the prospective jurors that if they knew any reason why they should not be a juror that they could inform the court privately at the bench. No one from the panel responded. Immediately after this question, the trial court asked if there were any additional questions that needed to be asked. After reviewing his questions, defense counsel only requested the trial court ask the prospective jurors if each would "be satisfied to be tried by a jury comprised of twelve persons who have your present frame of mind[.]" The question was asked with no audible response. The trial court then found the panel to be fully qualified as jurors, and the prosecutor and defense counsel exercised their rights of challenge.

At no time did defense counsel renew his request to question the prospective jurors individually after he learned through voir dire that the prospective jurors either had

---

5. From the record, it appears that frequently the prospective jurors made "no audible response" to questions asked by the trial court. Provided the trial court did not note a contrary non-verbal response, it is apparent that in these instances the prospective jurors were indicating to the trial court that their answers were ones that did not put their impartiality at further issue.

heard or read about this case in the media. Nor did defense counsel object to the trial court concluding that the prospective jurors were fully qualified to sit as jurors. In fact, the trial court gave defense counsel the opportunity to have additional questions asked, but defense counsel choose not to request any with regard to pretrial publicity.[6]

Consistently, we have held that under both the United States Constitution and the West Virginia Constitution a criminal defendant has a constitutional right to be tried by a fair and impartial jury. As we stated in Syllabus Point 4 of *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981):

"The right to a trial by an impartial, objective jury in a criminal case is a fundamental right guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article III, Section 14 of the West Virginia Constitution. A meaningful and effective *voir dire* of the jury panel is necessary to effectuate that fundamental right."

In accord, we stated in *State v. Ashcraft*, 172 W.Va. 640, 647, 309 S.E.2d 600, 607 (1983), that "we have long held that a criminal defendant is entitled to insist upon a jury 'composed of persons who have no interest in the case, have neither formed nor expressed any opinion, who are free from bias or prejudice, and stand indifferent in the case.'" *Quoting*

*State v. McMillion*, 104 W.Va. 1, 8, 138 S.E. 732, 735 (1927). One of the ways this fundamental right is achieved is by voir dire which allows both the litigants and the trial court to discover any bias or prejudice a juror may harbor.[7]

We have recognized that the decision of how to conduct voir dire rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court abused its discretion. As we stated in Syllabus Point 2 of *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987):

" 'In a criminal case, the inquiry made of a jury on its *voir dire* is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused.' Syl. pt. 2, *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944)."

*See also* Syllabus Point 5, *State v. Ward*, 188 W.Va. 380, 424 S.E.2d 725 (1991).

We said in *State v. Ashcraft*, 172 W.Va. at 648, 309 S.E.2d at 608, that a determination as to whether a trial court abused its discretion by refusing to allow individual voir dire of prospective jurors depends upon the facts and circumstances of each case. Additionally, we concluded in Syllabus Point 1 of *State v. Harshbarger*, 170 W.Va. 401, 294 S.E.2d 254 (1982), that the true test to determine if jurors are qualified is if they can disregard any prior opinions

---

6. The fact that the defendant did not take advantage of the opportunity to supplement voir dire is not necessarily dispositive of the issue of whether he waived an objection. However, a defendant cannot take advantage of new developments or facts on appeal that did not exist at the time the trial court originally denied a motion unless the defendant renews the objection after such information is disclosed to the trial court. If the objection is not renewed, this Court will consider only that information the trial court was aware of when it originally denied the motion. See Syllabus Point 1 of *Wimer v. Hinkle*, 180 W.Va. 660, 379 S.E.2d 383 (1989), where we said:

"An objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, *unless there has been a significant change in the basis for admitting the evidence.*" (Emphasis added).

7. The right to voir dire is codified in W.Va.Code, 56–6–12 (1923), and also is provided for by Rule

24(a) of the West Virginia Rules of Criminal Procedure.

The relevant section of W.Va.Code, 56–6–12, states:

"Either party in any action or suit may, and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein[.]"

The pertinent part of Rule 24(a) provides:

"(a) *Examination.* The court may permit the defendant or his attorney and the attorney for the state to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the state to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

they may have had and base a verdict solely on the evidence and the trial court's instructions.

In the present case, the defendant argues that the trial court abused its discretion and conducted inadequate voir dire similar to what occurred in *State v. Walker,* 188 W.Va. 661, 425 S.E.2d 616 (1992). We disagree. In *Walker,* almost all the prospective jurors indicated that they had heard or read about the crime. The trial court then asked the entire panel whether anyone had formed an opinion as to the defendant's guilt or innocence. The trial court did not ask what the prospective jurors had heard or read, and it did not permit the prospective jurors to be individually questioned, in spite of "a strong prima facie showing of hostile sentiment and bias." 188 W.Va. at 671, 425 S.E.2d at 626.

In the present case, unlike *Walker,* the trial court asked the prospective jurors at least four times whether any of them had formed an opinion as to the defendant's guilt or innocence and asked additional questions focusing on this area of concern. The trial court questioned one prospective juror separately at a bench conference and, at the close of the questioning, invited any of the prospective jurors to individually approach the bench and discuss privately any reason why the prospective juror believed she or he should not be a juror.

Moreover, we find it significant that at no time after defense counsel learned that all the prospective jurors had either heard or read about this case did counsel renew his request to conduct individual voir dire. Nor, when the trial court asked the parties if they had any additional questions, did defense counsel request, after he took a moment to review the 107 questions he submitted to the trial court, any further inquiry be conducted with regard to the media coverage.[8] Likewise, he did not object to the prospective jurors being qualified. As we said in *State v. Beckett,* 172 W.Va. 817, 823, 310 S.E.2d 883, 889 (1983), "[w]here ... the party does not seek additional voir dire to demonstrate possible bias or prejudice, there is no error in the court's refusal to strike such prospective jurors for cause." *See also State v. Ward,* 188 W.Va. 380, 393, 424 S.E.2d 725, 738 (1991).

For the foregoing reasons, we conclude that the trial court did not abuse its discretion under the facts of this case. The trial court gave defense counsel an adequate opportunity to address his concern with regard to the media coverage, but counsel choose not to pursue it. Defense counsel did not object to the jurors being qualified, and we do not find anything in the record that suggests that they were not qualified to serve.

## IV.

## PHOTOGRAPHS

The defendant's next argument is that the trial court committed reversible error by admitting "State's exhibits # 4 and # 5, which were pictures of the deceased young girl as she was found at the scene of the crime." Specifically, the defendant contends that these exhibits were "gruesome photographs" and their admission was forbidden by Rules 401 through 403 of the West Virginia Rules of Evidence[9] and by *State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26 (1979). Based upon what we decide today in reference to *Rowe,* our chief focus now is whether

8. *See* note 6, *supra.*

9. Rules 401 through 403 provide:
 "**Rule 401. Definition of 'Relevant Evidence'.** 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
 "**Rule 402. Relevant Evidence Generally Admissible; Irrelevant Evidence Inadmissible.** All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of West Virginia, these rules, or other rules adopted by the Supreme Court of Appeals. Evidence which is not relevant is not admissible.
 "**Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

the trial court abused its discretion in its application of the balancing test under Rule 403.

During a pretrial motion *in limine,* the prosecution requested that the trial court review two photographs for purposes of determining their admissibility. As stated by the prosecution, "[o]ne's a black and white and one's a color photograph both of the deceased victim lying in the field where she [the deceased victim] was found." The prosecution asked the trial court to find "that they are not gruesome and that no balancing test need be done. Should the Court decide that they are, in fact, gruesome and the balancing test needs to be done, we would argue that the probative value outweighs the prejudicial effect."

On the other hand, the defense contended that the photographs were unnecessary because the same evidence could be established through the testimony of other witnesses:

"It's my understanding the medical examiner who performed the autopsy will establish the cause of death. The color photograph and the black and white photograph, I don't know whether they are Exhibits 1 or 2 or how they are marked at this point.

\*　　\*　　\*　　\*　　\*　　\*

"We would ask it not be admissible. They are, in fact, gruesome."

Initially, the trial court ruled that the color photograph, Exhibit 4, was not gruesome and it could be admitted if a proper foundation was established. As to the black and white photograph, Exhibit 5, the trial court requested further argument regarding its relevancy. In response to this request, the prosecution stated that the black and white photograph was being admitted to establish the identity of the victim, the nature of the injuries, the position of the body in the field, and the arrangement of her clothing. The only response of the defense was that "[a]ll of which can be established by witnesses." The trial court then gave its final ruling: "The Court finds that that [sic] the black and white photograph is relevant aside from

showing quantity of blood appearing on or about the head of the victim, and is not, in fact, gruesome. Both may be admitted."

At trial, the principle discussion of the photographs occurred when one of the investigating officers, Chief Deputy Arthur L. Watson, Jr., testified to finding the body of the victim. In fact, his testimony primarily was concerned with the location of the knife as opposed to the body in Exhibit 4. As to Exhibit 5, the testimony of the deputy was that "it accurately represent[ed] and depict[ed]" what he visually observed at the time the body was discovered.

The defendant asks that we review the rulings of the trial court regarding the admission of these photographic exhibits under both *Rowe* and the Rule 403 balancing test. Our first concern, however, is whether *Rowe* survived the adoption of the West Virginia Rules of Evidence. *Rowe,* a case decided six years before the adoption of the West Virginia Rules of Evidence, comprises a two-step inquiry to decide the admissibility of photographs objected to as gruesome in criminal cases.

The first step under *Rowe* involves a determination as to whether the photographs are in fact gruesome. If the trial court makes the preliminary finding that the photographs are gruesome, the photographs are "presumed to have a prejudicial and inflammatory effect[.]" 163 W.Va. at 595, 259 S.E.2d at 28. Once a "gruesome" finding is made, photographs cannot be admitted unless the prosecution meets the second step of the *Rowe* inquiry and shows that the photographs "are of essential evidentiary value to its case." 163 W.Va. at 596, 259 S.E.2d at 28. While there is some question as to the standard of review regarding the "gruesome" finding,[10] most of our decisions indicate that a trial court's rulings regarding the admissibility of photographs are reviewed under an abuse of discretion standard. *State v. Trail,* 174 W.Va. 656, 328 S.E.2d 671 (1985).

Not only did *Rowe* give a distinct advantage to the defense by its allocation of the

---

**10.** *See State v. Young,* 173 W.Va. 1, 14–15, 311 S.E.2d 118, 132 (1983) (this Court made its own gruesome finding).

ultimate burden of proof to the prosecution but, for the first time in West Virginia's jurisprudence, it conditioned the admissibility of evidence on an "essential evidentiary value" standard.[11] Under the *Rowe* analysis, Rule 403 is used only if the trial court finds the photographs not to be gruesome. *See State v. Dye,* 171 W.Va. 361, 298 S.E.2d 898 (1982). Whatever the wisdom and utility of *Rowe* and its progeny, it is clear that the *Rowe* balancing test did not survive the adoption of the West Virginia Rules of Evidence. Therefore, *Rowe* is expressly overruled because it is manifestly incompatible with Rule 403.[12]

At the present time, the West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts. *See* W.Va.R.Evid. 101.[13] These rules constitute more than a mere refinement of common law evidentiary rules; they are a comprehensive reformulation of them. As the United States Supreme Court declared in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2794, 125 L.Ed.2d 469, 479 (1993), the Federal "Rules occupy the field." (Citation omitted). A similar construction has been given to the West Virginia Rules. *See Wilt v. Buracker,* 191 W.Va. 39, 44, 443 S.E.2d 196, 201 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994) (citing the United States Supreme Court's determination that the *Frye* rule, *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923), was inconsistent with Rule 702). Thus, the Rules of Evidence impliedly repeal prior decisional admissibility rules that have not been codified. Again, referring to the Federal Rules of Evidence, the United States Supreme Court in *United States v. Abel,* 469 U.S. 45, 51–52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450, 457 (1984), quoted the Reporter's comment for the Advisory Committee which drafted the Rules and stated: " 'In principle,

**11.** Unlike *Rowe,* under Rule 403, it is unnecessary to make a "gruesome" finding before applying a balancing test. An analysis under Rule 403 begins with a finding of whether a photograph is relevant. If relevant, then and only then is its probative value weighed against the prejudicial nature of the exhibit. We believe the Rule 403 approach is preferable. Whether a photograph is "gruesome" is in fact an important factor to be considered, but the initial focus on determining the admissibility of evidence is its relevancy and the strength of its probative value. If the trial court is satisfied that the evidence is not relevant under Rule 401, there is no need for further balancing under Rule 403.

**12.** Even in the absence of the West Virginia Rules of Evidence, the continued vitality of *Rowe* is questionable. Gruesome photographs simply do not have the prejudicial impact on jurors as once believed by most courts. "The average juror is well able to stomach the unpleasantness of exposure to the facts of a murder without being unduly influenced.... [G]ruesome or inflammatory pictures exists more in the imagination of judges and lawyers than in reality." *People v. Long,* 38 Cal.App.3d 680, 689, 113 Cal. Rptr. 530, 537 (1974). As early as 1968, the Kentucky court questioned whether photographs of deceased victims had any prejudicial impact. In *Napier v. Commonwealth,* 426 S.W.2d 121, 122–23 (Ky.Ct.App.1968), the court stated:

"The fact is that it was not so gruesome as to be likely to prejudice or inflame the men and women, inured as they are to the horrors of both war and television, who sit on a modern jury. The time has come when it should be presumed that a person capable of serving as a juror in a murder case can, without losing his head, bear the sight of a photograph showing the body of the decedent in the condition or place in which found. 'Where the photographs revealed nothing more than the scene of the crime and the persons of the victims, they were not incompetent.' *Salisbury v. Commonwealth* [, 417 S.W.2d 244, 246 (Ky.Ct.App. 1967) ]."

Additionally, it is questionable whether *Rowe* has been extended to civil cases where "gruesome" photograph objections have been made. *Compare with Pasquale v. Ohio Power Co.,* 187 W.Va. 292, 418 S.E.2d 738 (1992) (the Court referred to the "gruesome" photograph rule as part of the Rule 403 balancing test); *Helmick v. Potomac Edison Co.,* 185 W.Va. 269, 406 S.E.2d 700, *cert. denied,* 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991) (the Court did not mention the "gruesome" photograph rule in its evaluation). It is difficult in this context to discern an analytical justification for applying two different standards to identical evidence and objections merely because the objection was made in a criminal as opposed to a civil case.

**13.** Rule 101 states:

"**Rule 101. Scope.** These rules govern proceedings in the courts of this State to the extent and with the exceptions stated in Rule 1101. Rules of evidence set forth in any West Virginia statute not in conflict with any of these rules or any other rules adopted by the Supreme Court of Appeals shall be deemed to be in effect until superseded by rule or decision of the Supreme Court of Appeals."

under the Federal Rules no common law of evidence remains. "All relevant evidence is admissible, except as otherwise provided...." In reality, of course, the body of common law knowledge continues to exist, though in the somewhat altered form of a source of guidance in the exercise of delegated powers.' [Citation omitted]." (Ellipsis in *Abel*).

■■■ When specific authority to resolve an evidentiary issue under the Rules is absent, admissibility must be determined by reference to the general provisions governing the admission of relevant evidence. Having concluded that the *Rowe* "gruesome photograph" rule was not codified as part of the West Virginia Rules of Evidence, we now hold that the admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403.[14]

■■ Rule 401 defines relevant evidence in terms of probability. The relevant inquiry is whether a reasonable person, with some experience in the everyday world, would believe that the evidence might be helpful in determining the falsity or truth of any fact of consequence. *See generally Young v. Saldanha*, 189 W.Va. 330, 336, 431 S.E.2d 669, 675 (1993). Rule 402 provides that all relevant evidence is admissible limited only to certain specified exceptions not pertinent here. *See also Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 497, 345 S.E.2d 791, 796 (1986) ("[t]he general rule is that pictures or photographs that are relevant to any issue in a case are admissible"). It can be said that although Rules 401 and 402 strongly encourage the admission of as much evidence as

possible, Rule 403 restricts this liberal policy by requiring a balancing of interests to determine whether logically relevant is legally relevant evidence. Specifically, Rule 403 provides that although relevant, evidence may nevertheless be excluded when the danger of unfair prejudice, confusion, or undue delay is disproportionate to the value of the evidence. *See State v. Dillion*, 191 W.Va. 648, 447 S.E.2d 583, 596 (1994).

Applying these rules to a "gruesome" photograph objection, Rule 401 requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.

In the case at bar, we find that although the photographs had only slight relevance, they were not in any way "unfairly prejudicial." A careful review of the exhibits reveals nothing more than a body laying in a field. The exhibits were not hideous, ghastly, horrible, or dreadful. We find that the probative value in showing the jury the condition, identity, and location of the body clearly outweighs any speculative prejudicial effect. While proof of the condition and identity of the body was amply established by the testimony of the witnesses who found the body and the pathologist,[15] the photo-

---

**14.** This Court does not question a need for judicial standards to limit the admissibility of prejudicial photographs. Indeed, the *Rowe* Court found it necessary to stem the resulting influx of inflammatory photographs especially in cases where the prejudicial nature of the photographs was substantial and the claims of relevance were increasingly tenuous. We merely hold that Rule 403's balancing test adequately protects against these abuses.

Thus, our decision to change the method of analysis in resolving gruesome photograph objections should not be construed by prosecutors, lawyers, and trial judges of this State as an indication that we are adhering to a "lesser" admissibility standard. To the contrary, factors

such as whether the photograph was black and white, whether there was blood and gore, or whether there was a mangled and distorted face or body are still to be considered under Rule 403. When gruesome photographs are offered with only slight probative value and because of their prejudicial nature are likely to arouse passion and anger, they should be excluded by the trial judge. Otherwise, on appeal, this Court will not hesitate to reverse.

**15.** One important factor under Rule 403 is the prosecutor's need for the proffered evidence. If the exhibit is the only available evidence, its probative value is high. On the other hand, if other evidence equally is available and is sub-

graphs were simply not of the nature to arouse passion and cause the jury to decide this case on improper grounds. Here, there was no parade of horrors, and we refuse to interfere with the trial court's exercise of its discretion.

## V.

### JURY INSTRUCTIONS

#### A.

*Adequacy of the Instructions Given*

■ The defendant's fourth assignment of error is that the trial court improperly denied five of the jury instructions he submitted. In reviewing the adequacy of a trial court's choice and selection of jury instructions, we accord the trial court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law. Furthermore, the trial court has broad discretion in determining the wording of the jury instructions. As long as the jury instructions given by the trial court adequately and accurately cover the substance of the requested instructions, there is no abuse. *State v. Beegle*, 188 W.Va. 681, 686–87, 425 S.E.2d 823, 828–29 (1992).

We have said that " '[i]t is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court.' Syl. pt. 20, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966)." Syllabus Point 4, *State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870 (1988).[16] Moreover, in Syllabus Point 2 of *State v. Hobbs*, 178 W.Va. 128, 358 S.E.2d 212 (1987), we stated that " '[i]t is error to give instructions to the jury, even though they state correct propositions of law, when there is no evidence to support some of the hypotheses which they contain.' Syllabus point 7, *State v. Morris*, 142 W.Va. 303, 95 S.E.2d 401 (1956)." Thus, in this case, our review is limited to an examination of the instructions as a whole to determine whether

they sufficiently covered those requested by the defendant.

The defendant first complains that his offered instruction number 11 should have been given because it would have made the jurors aware that if they had reasonable doubt with regard to any specific element or fact constituting an offense, they should find him not guilty of the charge. The defendant requested the trial court to instruct the jury as follows:

"The Court instructs the jury that if they find there is a conflict in the evidence in this case on any fact or circumstance tending to establish the guilt or innocence of the Defendant, a part of which is in favor of the theory of the State and a part is in favor of the Defendant, and the jury should entertain a reasonable doubt as to which is true, then it is [the] duty of the jury in arriving at their verdict to adopt the evidence, theory and conclusions most favorable to the Defendant."

The trial court refused the instruction concluding that it already was covered in the charge. Specifically, the trial court instructed the jury that if it "views the evidence as reasonably permitting either of two conclusions, one of innocence, the other of guilt, the Jury should adopt the conclusion of innocence." The trial court also instructed the jury that "[e]very essential element of the offense must be proved beyond a reasonable doubt before the defendant can be convicted." We find these two instructions adequately covered instruction number 11 offered by the defendant, and the trial court acted properly by refusing to give the defendant's requested instruction.

■ While the defendant may be correct in his implicit assessment that the proffered instruction may have been more charitable to his trial position, we consistently have held that "adequacy" not "charity" is the standard by which we review instructions for error:

---

stantiated, the proffered evidence has a much lower probative value which must then be balanced against its potential for undue prejudice. In the present case, we find no undue prejudice, and, therefore, we conclude the ruling was within the sound discretion of the trial court.

16. *See also State v. Bartlett*, 177 W.Va. 663, 355 S.E.2d 913 (1987); *State v. Thompson*, 176 W.Va. 300, 342 S.E.2d 268 (1986).

"The rule in this State regarding this situation provides: ' "It is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court." Syl. pt. 20, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966).' Syllabus point 3, *State v. Evans*, 172 W.Va. 810, 310 S.E.2d 877 (1983). While the instruction offered by the defendant may have been more 'charitable,' the Court does not believe that the trial judge's refusal to give it constituted reversible error in light of the charge actually given."

*State v. Thompson*, 176 W.Va. 300, 307–08, 342 S.E.2d 268, 276 (1986). A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

Recently, in *Victor v. Nebraska*, —— U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), the Supreme Court reiterated its previous holding in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). In *Victor*, —— U.S. at ——, 114 S.Ct. at 1243, 127 L.Ed.2d at 590, the Supreme Court stated that "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof[, so long as] . . . 'taken as a whole, the instructions . . . correctly conve[y] the concept of reasonable doubt to the jury.' *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, [138], 99 L.Ed. 150, [167]." (One citation omitted). The Supreme Court upheld jury instructions as constitutional: (1) where, taken as a whole, the instructions correctly conveyed the concept of reasonable doubt; and (2) where there was no "reasonable likelihood that the jury understood the instructions to allow [a] conviction based on proof insufficient to meet the *Winship* standard."[17] —— U.S. at ——, 114 S.Ct. at 1243, 127 L.Ed.2d at 591 (*citing Estelle v. McGuire*, 502 U.S. 62, 72 and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385, 399 and n. 4 (1991) (holding that whether the instruction "could have" been applied in an unconstitutional manner is not the proper inquiry)).

In sum, we find that the instructions given by the trial court were not misleading or confusing to the jury such that there was a reasonable likelihood that the conviction was based on insufficient proof, and, when viewed in the context of the charge as a whole, the instructions " 'correctly convey[ed] the concept of reasonable doubt to the jury.' " *Victor*, —— U.S. at ——, 114 S.Ct. at 1243, 127 L.Ed.2d at 590. (Citation omitted). Accordingly, we uphold the instructions given by the trial court as constitutionally valid, and find no error in the refusal by the trial court to give the defendant's instruction number 11.

## B.

### Refusal to Give Instructions

The defendant also claims that his instruction number 21 should have been given. This instruction covered the uncorroborated testimony of the surviving victim. The defendant requested the trial court to instruct the jury as follows:

"The court instructs the jury that if you *believe* from the evidence in this case that the crime charged against the defendant rests alone on the testimony of the prosecuting witness, then you should scrutinize [her] testimony with care and caution; although a conviction of a sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible." (Emphasis added).

Whether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. Of course, in criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution. After reviewing the record, we conclude the

17. *See In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding that the government must prove beyond a reasonable doubt every element of the charged offense).

trial court did not err by refusing to give the instruction. The trial court found that the proffered instruction was not required because it was not supported by the evidence. We agree. Two principles of law undergird our decision. First, a trial court does not have to instruct the jury on law that is irrelevant to the case. Second, a trial court can refuse an instruction not raised by sufficient evidence. *See State v. Gum*, 172 W.Va. 534, 309 S.E.2d 32 (1983).

■ In Syllabus Point 2 of *State v. Ray*, 171 W.Va. 383, 298 S.E.2d 921 (1982), we held: "Where the testimony of the victim of a sexual offense is corroborated to some degree, it is not reversible error to refuse a cautionary instruction that informs the jury that they should view such testimony with care and caution." In determining whether there is corroboration, this Court in Syllabus Point 3 of *State v. Vance*, 164 W.Va. 216, 262 S.E.2d 423 (1980), established this standard:

"Where the testimony of an accomplice is corroborated in material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony, it is not error to refuse a cautionary instruc-

tion. This rule applies even though the corroborative evidence falls short of constituting independent evidence which supports the alleged ultimate fact that the accused committed the offense charged."

In this case *sub judice*, the testimony of the victim, Dana, was corroborated by a significant amount of both physical and circumstantial evidence.[18] Having found that there was sufficient corroboration under *Vance*, we conclude that defendant's allegations of error as to instruction number 21 has no merit.

■ The remaining three jury instructions offered by the defendant are related to the crime of attempted sexual assault in the first degree. Two of these instructions explain the elements of the crime and differ only in respect that one instruction contains Dana's name while the other instruction contains Connie's name.[19] The other instruction lists and defines key terms used in the attempted sexual assault in the first degree instructions.[20] The trial court denied these three instructions finding that there was no evidence supporting an attempt theory, and many of the definitions offered were extraneous to the case or otherwise were covered in

---

18. Some of the evidence presented at trial supporting Dana's testimony includes the following:

First, the testimony of Dana is substantially similar to the testimony of Bobby N.

Second, the defendant admits to having sexual intercourse with Dana.

Third, although the vaginal smears taken from Connie did not show the presence of sperm, the pathologist testified that he found dirt between Connie's legs.

Fourth, a knife was found in the vicinity of Connie's body.

Fifth, on December 4, 1990, the police found a pair of underwear in the defendant's garbage can at his residence. Trooper Bowles stated that there was blood on the underwear; however, the quantity or the condition of the blood prevented it from being identified.

Sixth, a red baseball bat was found in the Miller Hill Road area by a witness who testified that he believed the property where the bat was found was owned previously by the defendant's aunt. The defendant identified the bat as belonging to his brother, and he said he thought it was in the trunk of the car on the night of the crimes.

Seventh, two witnesses who saw the defendant, Bobby N., Connie, and Dana riding around earlier in the Moundsville area described the defendant as the driver of the car.

19. These two instructions, numbered 12 and 13 by the defendant, state:

"In order to find Thomas Russell Leroy Derr guilty of Attempted First Degree Sexual Assault you must find that Mr. Derr attempted to commit, but failed to commit or was prevented from committing sexual intercourse or sexual intrusion with [victim's name] without her permission and the lack of her consent resulted from forcible compulsion or that Thomas Russell Leroy Derr attempted to commit but failed to commit or was prevented from committing sexual intercourse or sexual intrusion with [victim's name] who was physically helpless. If you find Thomas Russell Leroy Derr guilty of Attempted First Degree Sexual Assault he shall be guilty of a Misdemeanor, and, upon conviction shall be confined in jail for not less than six nor more than twelve months and shall be fined a sum not to exceed $500.00. W.Va. Code § 61–11–8 § 61–8B–3"

20. This instruction, numbered 23 by the defendant, defines forcible compulsion, mentally incapacitated, physically helpless, sexual contact, sexual intercourse, sexual intrusion, bodily injury, serious bodily injury, and deadly weapon.

the charge.[21] After reviewing the record, we agree with the trial court's conclusions.

## VI.

### ADMONISHMENT OF THE JURY

The defendant argues the trial court erred by failing to admonish the jury prior to "several" recessés taken during the trial. The defendant asserts that, given the gravity of the offense and the amount of media coverage the case received, the trial court should have admonished the jury at every recess to ensure that he was provided a fair and impartial trial. However, we find that the trial court gave a detailed admonition at the beginning of the trial. The trial court told the jury:

> "Throughout this trial, under no circumstances permit anyone to discuss this case with you or you to discuss the case with anyone as well, and throughout the trial, to avoid any misunderstandings whatsoever, do not engage in any conversations whatsoever with parties participating in the trial or their counsel and others that may seek your attention in this regard.

> "During this entire trial, when we recess and when you return to court, do not linger in the hallways but retire to the jury room to await your call into open court.

> "... [A]nd throughout the trial, when we return for each day of trial, where certain media attention is being given of the trial; radio, television, press, please do not listen to those reports or view those reports or read anything about the trial until its conclusion."

Similarly, during the three days of trial, admonitions were given to the jury prior to each lunch break and at the end of each day. In fact, prior to the lunch break on the final day of trial, the trial court told the jury that it was "critical" that they do not hear, read, or discuss the case or it could result in a mistrial.

The only times that we can find that the trial court did not admonish the jury was prior to a few short recesses. Prior to these recesses, defense counsel never objected to the lack of admonishments nor did he request any be given. Under these facts, we are satisfied with the manner in which the trial court admonished the jury, and we find no error.

## VII.

### ZAIN EVIDENCE

The defendant asserts that the trial court erred by allowing Fred Zain, who at the time was the Chief Physical Evidence Officer and a serologist in Bexar County, Texas, to testify with regard to tests performed by Henry Holiday who was under Mr. Zain's supervision. We decline to address this issue at this time.

It is not our practice to address claims such as this one on direct appeal. Accordingly, we require that the defendant first assert such a claim in a collateral proceeding under W.Va.Code, 53–4A–1, *et seq.*, so that the trial court can develop a more complete evidentiary record with regard to this constitutional violation claim and what, if any, effect it had on the trial's outcome. There is no reason here to depart from this customary practice because this case is not one where the error and its effect are apparent from the trial record itself. *See State v. Kilmer*, 190 W.Va. 617, 439 S.E.2d 881 (1993).

The proper procedure to handle cases in which Mr. Zain testified is controlled by our prior case of *In the Matter of West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993) (*Zain I*). In *Zain I*, we adopted a report filed by the Honorable James O. Holliday who recommended that any post-conviction habeas corpus relief filed as the result of the investigation of Mr. Zain should consider "the issue of whether the remaining evidence at trial would have been sufficient to support the conviction." *In the Matter of West Virginia State Police Crime Laboratory, Serology Division*, 191 W.Va. 224, 225, 445 S.E.2d 165, 166 (1994).

---

21. Of the definitions offered by the defendant, the trial court elsewhere in the charge instructed the jury as to the definitions of sexual inter-course, serious bodily injury, deadly weapon, and forcible compulsion.

Therefore, we conclude that the defendant may pursue this matter in a habeas corpus proceeding. If the defendant pursues it, the habeas court has the duty to determine whether enough evidence exists against the defendant to support his conviction without considering any of the evidence offered by Mr. Zain. In addition, it is at the habeas court level that the defendant initially should raise his argument that but for Mr. Zain's testimony he would not have taken the stand on his own behalf. If the habeas court determines that the defendant would not have testified, it must determine whether his testimony had a material effect on the jury verdict. *See* Syllabus Point 2, *Zain I.*[22]

## VIII.

### REMAINING ERRORS

We find the defendant's remaining three assignments of error are without merit.[23] Therefore, we decline to address them.

## IX.

### CONCLUSION

For the foregoing reasons, we hereby affirm the final order of the Circuit Court of Marshall County. If the defendant chooses, he may seek post-conviction habeas corpus relief with regard to the evidence submitted by Mr. Zain.

Affirmed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

**22.** Syllabus Point 2 of *Zain I* provides that "[a]lthough it is a violation of due process for the State to convict a defendant based on false evidence, such conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict."

**23.** The remaining three alleged errors are that: (1) it was improper for the trial court to permit the prosecuting attorney to ask Trooper Bowles a hypothetical question based upon testimony that occurred later in the trial; (2) it was reversible error for the trial court to deny the defendant's motion for a continuance in order to obtain his own DNA expert; and (3) cumulative error prevented the defendant from having a fair and impartial trial.