528 S.E.2d 490

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Ronald Lynn CALLOWAY, Defendant Below, Appellant.**

No. 26204.

Supreme Court of Appeals of West Virginia.

Submitted Nov. 3, 1999.

Decided Dec. 16, 1999.

Concurring Opinion of Chief Justice Starcher Jan. 6, 2000.

ney General, Charleston, West Virginia, Attorneys for Appellee.

McGRAW, Justice:

Defendant Ronald Calloway was convicted in August 1998 on six counts of second-degree sexual assault, W. Va.Code § 61–8B–4 (1991), and one count of daytime entering without breaking, W. Va.Code § 61–3–11(b) (1993), in connection with an episode where he forced his way into a woman's home, severely beat her when she attempted to escape, and forced her to engage in repeated acts of oral sex.[1] Calloway asserts on appeal that the circuit court improperly excluded DNA evidence under our Rape–Shield Statute, W. Va.Code § 61–8B–11 (1986), which evidence was purportedly exculpatory in that it excluded him as a possible source of semen found on the victim's bed. We find no merit in this argument because the evidentiary proffer made to the court below never indicated that the semen was deposited in connection with the incident in question; rather, this evidence was offered for the sole purpose of impeaching the victim's testimony by demonstrating that a sexual relationship existed between the victim and another individual alleged to be her boyfriend. Consequently, this evidence was properly excluded under the Rape Shield Statute. We therefore affirm Calloway's conviction.

## I.

## FACTUAL BACKGROUND

The victim in this case, A.H.,[2] testified at trial that she was awoken by a knock on her door at 3 a.m. on the morning of August 29, 1995.[3] Looking through a window adjacent to the door, she observed Calloway, who was asking for an individual who had apparently lived in the house previously. A.H. told the defendant that the person he was looking for

Ira Mickenberg, Esq., George Castelle, Esq., Charleston, West Virginia, Attorneys for Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attor-

---

1. Calloway was sentenced to six concurrent ten-to-twenty year terms of imprisonment on the sexual assault convictions, to be served consecutively with a one-to-ten year term on the burglary conviction.

2. Because of the sensitive nature of the facts involved in this case, we identify the victim in this case by her initials only.

3. A.H. indicated that she lived alone in a small house in Charleston, West Virginia, and that she had moved to that location just three weeks before the attack.

no longer lived there; and when he asked to call a taxi, she indicated that she had no telephone. Calloway left, and A.H. returned to bed.

Between 6:30 a.m. and 7 a.m. the same morning, A.H. was again roused by a knock on the door. This time A.H. opened the door without inquiring who it was, explaining that she assumed it was either her mother, whom she thought might be stopping by to take her to see her grandmother at the hospital, or a male friend who sometimes stopped by with breakfast on his way to work. Instead, she was faced by the same man who had visited her door four hours before. She again told the defendant that the person he was looking for no longer lived there, and began to close the door. According to A.H., Calloway forced his way into the house and locked the door behind him. She stated that he then pulled his sleeveless tanktop shirt over his head to obscure his identity, and told her not to scream.

After forcing his way into the victim's home, Calloway began making vulgar sexual comments toward A.H., and asked her if she had any crack cocaine (she said no). Shortly afterward, A.H. heard elementary-school children walking down the adjacent alleyway, and the defendant told her to keep quiet. According to the victim, Calloway then forced her into the living room (where she had been sleeping on a futon mattress), and insisted that she remove his penis from his shorts. A.H. testified that at this point she reached for a hammer under her pillow, and "stood up and swung at his head all at the same time. I saw him go over so I just assumed that I . . . hit him." She ran for the door, but the defendant caught her just as she was opening it. A struggle ensued, according to A.H., where she maintained a firm grip on both the doorknob and Calloway's exposed penis, while he repeatedly struck her and bit her shoulder after placing her in a headlock.[4] The victim testified that one blow eventually spun her around, and she could see her own blood hitting the wall. The defendant then forced her back into the living room and shoved her face into a pillow on the bed to the point where she had difficulty breathing. The victim stated that because she was fearful that defendant was smothering her, she agreed to do whatever Calloway wanted.

The defendant then forced A.H. to engage in alternating rounds of oral sex, during which he placed his finger in the victim's vagina and anus. When Calloway finally indicated a desire for intercourse, A.H. pleaded exhaustion, and asked if she could rest. The defendant laid down next to her, trapping the victim by placing his arm and leg over her. After waiting for Calloway to fall asleep, A.H. spent twenty minutes slowly moving his arm and leg off of her, and then ran for the door. According to her testimony, she ran down an alley until she found a neighbor, who took her into his home and called the police.

Officers from the Charleston Police Department responded and were directed to A.H.'s house, where they found Calloway still asleep with a red shirt pulled over his face. Forensic testing later identified traces of A.H.'s blood on Calloway's shorts and underwear. Also, A.H.'s blood was found on the floor and walls near the front door of the house. The physician who treated the victim after she was transported to the hospital, Dr. Lisa Skinner, testified that A.H. suffered a vertebral fracture, as well as bruising and a bite-related injury to the shoulder. Dr. Skinner also testified that she found no evidence that the victim had been forcibly penetrated.

Calloway's theory of the case was that he and A.H. met the previous night, and had gone to her house to smoke crack cocaine. The defense argued that the victim's boyfriend stopped at the house the following morning, became enraged upon seeing Calloway asleep in the house, and inflicted the wounds later observed on A.H.[5] Calloway

4. The State argued at trial, without presenting expert testimony on the issue, that a bite mark on the victim's shoulder (represented in a photograph) matched defendant's dentition, in that Calloway is missing certain teeth.

5. In his brief, Calloway indicates that he argued at trial that A.H. was possibly sexually assaulted by her supposed boyfriend. Our review of the record, however, indicates that no such suggestion was ever made before the jury. In fact, in

did not testify at trial. Instead, the salient evidence supporting his theory was (1) a "crack pipe" found among Calloway's belongings, which subsequently tested positive for cocaine; (2) the victim's statement that a male friend sometimes stopped by with breakfast on his way to work; (3) testimony from the arresting police officers who stated that they did not observe any injuries or blood on Calloway's body[6]; and (4) the testimony of the defendant's sole witness at trial, Debra Gibson, a neighbor who stated that she had previously observed drug-related activity at the victim's house (she did not indicate whether such activity was contemporaneous with A.H.'s occupancy), and who testified to hearing voices from the alleyway adjacent to the victim's home at both 11 p.m. and 3 a.m. on the night in question.

## II.

## STANDARD OF REVIEW

This Court's review of evidentiary rulings made by a trial court is highly deferential: "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. pt. 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds, State ex rel. R.L. v. Bedell,* 192 W.Va. 435, 452 S.E.2d 893 (1994); *see also* Syl. pt. 4, *Riggle v. Allied Chem. Corp.,* 180 W.Va. 561, 378 S.E.2d 282 (1989). As we explained in *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995), "[i]n general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are

assessed but the circuit court makes a serious mistake in weighing them." *Id.* at 520 n. 6, 466 S.E.2d at 179 n. 6.

## III.

## DISCUSSION

The sole issue raised in this appeal is Calloway's assertion that the trial court erred in excluding the results of deoxyribonucleic acid (DNA) testing performed on a stain found on the victim's futon mattress, which indicated the presence of semen that could not have come from the defendant. A.H.'s genetic markers were, however, found in the stain, suggesting that it was the result of her having had sex with another individual. Calloway asserts that such evidence was exculpatory in that it demonstrates that he was not the person who sexually assaulted the victim, and that the trial court's exclusion of this evidence was (1) an erroneous application of the Rape–Shield Statute, W. Va.Code § 61–8B–11 (1986), because the evidence falls under an exception set forth in W. Va. R. Evid. 404(a)(3) pertaining to acts related to the charged offense; and (2) to the extent that such evidence was excludable under the statute, such ruling was an unconstitutional application of the Rape Shield Statute, in that it violated his constitutional right to present a defense at trial. We consider these arguments in turn.

## A.

### Rape–Shield Statute

We recently stated in syllabus point 1 of *State v. Guthrie,* 205 W.Va. 326, 518 S.E.2d 83 (1999), that "W. Va.Code § 61–8B–11(b) (1986)[7] bars the introduction of evi-

---

making its case the defense put considerable emphasis on the absence of any direct physical evidence of sexual assault.

**6.** One of Calloway's primary stratagems at trial was to point out shortcomings in the State's forensic evidence. For example, it was shown that his shirt and tennis shoes were not tested for blood (both had apparently accompanied him to jail), and that no skin was found under the victim's fingernails. The defense also stressed that the State had failed to test for the presence of saliva on a vaginal swab taken from the victim.

**7.** W. Va.Code § 61–8B–11(b) provides:

In any prosecution under this article evidence of specific instances of the victim's sexual conduct with persons other than the defendant, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible: Provided, That such evidence shall be admissible solely for the purpose of impeaching credibility, if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

dence, in a sexual assault prosecution, concerning (1) specific instances of the victim's sexual conduct with persons other than the defendant, (2) opinion evidence of the victim's sexual conduct and (3) reputation evidence of the victim's sexual conduct." (Footnote added.) This general exclusion of evidence relating to a victim's prior sexual conduct is, however, subject to certain enumerated exceptions. In syllabus point 2, in part, of *Guthrie*, we indicated that such evidence is admissible for impeachment purposes when a victim makes his or her past sexual conduct an issue at trial:

> Under the statute, evidence of (1) specific instances of the victim's sexual conduct with persons other than the defendant, (2) opinion evidence of the victim's sexual conduct and (3) reputation evidence of the victim's sexual conduct can be introduced solely for the purpose of impeaching the credibility of the victim only if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

We further recognized in syllabus point 3 of *Guthrie* that sexual-conduct evidence is admissible if it has a direct relationship with the criminal conduct alleged:

> Rule 404(a)(3) of the West Virginia Rules of Evidence provides an express exception to the general exclusion of evidence coming within the scope of our rape shield statute. This exception provides for the admission of prior sexual conduct of a rape victim when the trial court determines *in camera* that evidence is (1) *specifically related to the act or acts for which the defendant is charged* and (2) necessary to prevent manifest injustice.

(Emphasis added.)

Calloway contends that the DNA evidence should have been admitted because it falls under the exception to the Rape Shield Stat-

ute contained in Rule 404(a)(3),[8] which permits evidence of prior sexual conduct if it is specifically related to the act for which a defendant is charged. Specifically, he asserts in his brief that such evidence was offered for an exculpatory purpose, and "that the DNA tests bore directly on the identity of the assailant." In other words, Calloway suggests that the DNA evidence was admissible because the semen identified as belonging to someone else was possibly deposited by the actual perpetrator during the course of the assault. Our review of the record, however, indicates that the evidence proffered to the circuit court had a distinctly different character and purpose than what is now asserted on appeal.

The State filed a pretrial motion *in limine* to exclude any evidence relating to the victim's past sexual conduct. Prior to the commencement of trial, the State raised the subject of this motion, making specific reference to the DNA evidence in question. Calloway's trial counsel responded by stating that the defense did "not inten[d] to get into that line of questioning." The defense later attempted to introduce this evidence, however, in response to testimony elicited by the prosecution from the victim regarding the nature of her relationship with a man she said sometimes brought her breakfast in the mornings:

> Q. When were you next awakened?
>
> A. I guess between 6:30 and 7:00 in the morning. It was already light out but it was early.
>
> Q. What woke you?
>
> A. A knock on the door.
>
> Q. Did that surprise you . . .?
>
> A. No.
>
> Q. Why didn't it surprise you?
>
> A. Well, my grandmother was in the hospital so I assumed it was either mom, she had mentioned coming to pick me up

---

8. Rule 404(a)(3) provides:

> (a) *Character Evidence Generally.* Evidence of a person's character or a trait of character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:
>
> . . . .
>
> (3) *Character of Victim of a Sexual Offense.* In a case charging criminal sexual misconduct, evidence of the victim's past sexual conduct with the defendant as provided for in W. Va. Code § 61–8B–11; and as to the victim's prior sexual conduct with persons other than the defendant, where the court determines at a hearing out of the presence of the jury that such evidence is specifically related to the act or acts for which the defendant is charged and is necessary to prevent manifest injustice.

because she knows me, she would have to wait for me to get ready so she would have been there early, to go to the hospital with her because I don't drive, so she would have picked me up, or a friend of mine usually stopped by.

I was bartending. He went to work early in the morning, I got home late and sometimes he would stop by and bring me breakfast before he had to be at work at 7:00, 7:30.

Q. *Was that friend a boyfriend?*

9. The *in camera* discussion regarding this issue was as follows:

MS. HUGHES [defense counsel]: .... Your Honor, I would like to ask this witness questions about the identified stain on the mattresses. What the lab technician testifies as to the testing, he will testify that it's sperm, not Mr. Calloway's.

The State has filed a motion in limine to keep us from asking that question. The reason why we believe we should be able to ask that question that is not covered by the Rape Shield Statute is that she testified this morning that she just had a friend that she believes stopped by her house every morning and that they had just started seeing each other and essentially portrayed herself as not really having a boyfriend, and our theory of the case all along has been we believe that her boyfriend came to the door and found her naked with Mr. Calloway after she and Mr. Calloway were making out and that he's the one that administered the beating.

Because of that, we need to be able to show that she was untruthful about her relationship with this supposed friend that came to the door in the morning.

We don't believe this is a collateral issue since our case is premised on the fact that it was her boyfriend that administered the beating.

MS. DRUMMOND [prosecutor]: Judge, the statute is very clear. Prior sexual activity is not admissible unless the victim's credibility and character is put into issue. She did not do that. What she testified to was that he was a friend. When asked if he was a boyfriend, she said that their relationship was moving in that direction. Now to her, whether or not that means having sex, no inquiry was made with regard to that.

MR. MCVEY [prosecutor]: Plus there was no evidence that she was a participant in that.

....

MS. HUGHES: Your Honor, we feel like we need the evidence for that if the defendant meets that conduct of the trial by introducing evidence. When she came in here and testified that this so-called person was just a friend and that's the way she portrayed it, and it was

A. *He was not serious, we were mostly friends. It was developing that way.*

Q. So when you heard this knock at your door, what did you do?

A. I opened it.

(Emphasis added.)

In making its offer of proof, the defense asserted that the DNA evidence was relevant to impeach the victim's testimony by demonstrating that she had previously had sex with the male friend whom she testified about.[9]

developing, that puts her credibility on that issue into play.

MS. DRUMMOND: Judge, our position is it doesn't. There's no identification of whose stains those are. Just because she said that the man who would come by was a friend, a boyfriend, moving in that direction, the fact that that sperm is there, it doesn't necessarily have to be his. It could have been a prior person's.

MS. HUGHES: In a three week period of time? She said she only lived there for three weeks. This is the first apartment, the first house she had.

THE COURT: Could you all have done DNA testing on that?

MS. HUGHES: It was done and it excluded Mr. Calloway.

THE COURT: Did it show it was the boyfriend?

MS. HUGHES: We don't know who the boyfriend is.

MS. DRUMMOND: Judge, again, without knowing whose sperm that is, this Court cannot say that she was not credible, but where it's slanted is that her testimony was in the context of her explaining the reasonableness of why she opened the door that morning, that this friend that she was expecting that brought her breakfast was coming by, and that's a simple, nice little explanation as to why somebody would open the door at six in the morning but it doesn't jive with the semen on the bed that's not his.

MR. MCVEY: And that's my point. There's absolutely no connection with semen on the bed with someone stopping by and giving her breakfast. Where is the connection there, Judge? There is none.

THE COURT: That's what she's trying to make.

MR. MCVEY: There's no point to make there. There no proof offered. We're just out here in la la land.

MS. HUGHES: You knew who the boyfriend's name was. You didn't test it to see if it was his semen and we've never been able to determine the name of the boyfriend. We don't know the name of the boyfriend. How could we have tested him?

MS. DRUMMOND: Did you ask her on the stand?

Note 9—Continued

MS. HUGHES: Her testimony was that this was not a boyfriend, it was developing in that direction.

. . . .

THE COURT: What was the first question you approached the bench on, [Ms. Hughes], about what you wanted to ask this witness? There was a specific point you wanted to make on your motion.

MS. HUGHES: This unidentified stain that was on the mattress, did he collect that sample from the mattress? The reason why I would ask him that is so when the lab technician come in, I would be able to ask him whether, in fact, it was tested. Was there any DNA analysis done on the stain, what was this stain and did that stain match Mr. Calloway.

MR. MCVEY: That's specifically what the rule is written to provide against, exactly.

MS. HUGHES: It provides an exception for her credibility, to impeach her credibility and this is not a collateral issue.

. . . .

MS. HUGHES: Your Honor, on the lab reports that were provided to us that discuss what the DNA evidence was with respect to this stain, and this puts to rest this notion that this was a used mattress, it clearly shows that that stain was Ms. Haynes' and some other unidentified person that was the depositor of the semen, not Mr. Calloway. So I think that puts to rest that it was a used mattress.

. . . .

THE COURT: The thing that's giving me the trouble is her innuendo about the relationship she had with her boyfriend.

MR. MCVEY: Judge, she never denied out and out never having sex with anyone. They wouldn't even be allowed to ask that question under the Rape Shield Statute. The only way they could have gotten into that is if she had, in some way, volunteered it herself and we were stupid enough to ask it.

. . . .

THE COURT: Why was that question asked, was that friend a boyfriend?

MS. DRUMMOND: Why was that question asked?

THE COURT: Yes.

MS. DRUMMOND: Because she had told the police officers that a friend stopped by, a boyfriend or her mother oftentimes, Judge. I was just clarifying that, Judge. Again, just because she said he was a friend moving in that direction doesn't mean in any way she denied having sex.

THE COURT: I mean, there was no identification given to the boyfriend. This vague thing, she didn't say a policeman stopped by. There's some connotation to boyfriend. No name was given. My friend. In other words, it was in the context of a relationship she was having with a boy.

MS. DRUMMOND: You don't have to sleep with every boyfriend you have.

THE COURT: You don't have to get into that. She talked about him bringing her breakfast, and my question was, what was the purpose of describing the relationship of the boyfriend?

MS. DRUMMOND: There was no purpose, Judge.

THE COURT: Why was that gone into?

MS. DRUMMOND: I just chose to do it.

MS. HUGHES: She opened the door.

MS. DRUMMOND: No, it didn't open the door.

THE COURT: What did it put in issue?

MS. DRUMMOND: It didn't put anything in issue.

THE COURT: I'm talking abut what she said.

MS. DRUMMOND: It didn't put anything into issue.

THE COURT: There had to be a purpose to the questioning. Somebody came to the door at six in the morning. Her mother came.

MS. DRUMMOND: I was simply asking what the relationship, why she opened the door, because she expected either this person or her mother. That's why it was asked. Not just some stranger off the street. Those two people came around at that time of the morning because, as she said, he would get off work. But you don't have any connection to that boyfriend to the semen, Judge, so by her simply saying they were friends moving in that direction, how does that put her character in issue? How does the fact there's semen in her bed put her character in issue?

THE COURT: All right.

MS. HUGHES: Because she's only lived there for three weeks and because their own lab reports has her stain on the mattress. That gets rid of the theory that this is a used mattress. This is a three week period of time and that still doesn't explain Ms. Drummond's explanation for why she inquired into the nature of the relationship of somebody that she testified came by her house and gave her breakfast. Ms. Drummond is the one that opened the door when she said is that a boyfriend, and that caused Ms. Haynes to be untruthful about the nature of her relationship with this man.

MS. DRUMMOND: How does the word "Boyfriend" result in an assumption, a presumption that she has slept with him?

MS. HUGHES: That's not what just she said. She didn't just say he was a boyfriend.

MS. DRUMMOND: You don't know whose sperm that is.

THE COURT: At this point, I'm going to have to side with the state. There's no proof that that was this guy's sperm, and the prejudicial value at this point, in my opinion, outweighs any [probative] evidence that it would have. It's a balancing test. I mean, I've been thinking about this for the four times that she's read that back. I followed it. I follow your logic.

I note your exception and objection, your strenuous one. I don't think it's a unreasonable or illogical argument that you made. I think it's a close call on a crucial issue and I

Calloway's trial counsel was apparently attempting to sustain the theory that this alleged "boyfriend" (who was never identified at trial) found the victim with Calloway and inflicted the beating. Importantly, at no time did defense counsel suggest that the evidence would show that the semen stain was directly related to the assault. Indeed, the victim had earlier testified that she was not aware of Calloway having ejaculated during the encounter. Also, in attempting to refute the victim's allegation that she had been sexually assaulted, the defense put considerable emphasis throughout trial on the fact that there was no direct physical evidence of such an assault.[10]

 This Court has indicated that the purpose of an offer of proof under W. Va. R. Evid. 103(a)(2) [11] "is to place upon the record excluded evidence, or to show upon the record what the excluded evidence would have proved in order that the appellate court may properly evaluate the correctness of the trial court's ruling excluding it." Syl. pt. 4, *State v. Rissler*, 165 W.Va. 640, 270 S.E.2d 778 (1980); *see also State v. Blake*, 197 W.Va.

700, 708, 478 S.E.2d 550, 558 (1996) (noting that one of the reasons for requiring offers of proof under Rule 103(a)(2) is to "aid the reviewing court in deciding whether the alleged error was of such magnitude that it was prejudicial to the substantial rights" of the proponent). Once a party has made such a particularized offer of proof under Rule 103(a)(2), it may not on appeal expand or modify the substance of the evidence put before the trial court. As we admonished in syllabus point 2 of *State v. Bosley*, 159 W.Va. 67, 218 S.E.2d 894 (1975), "[t]he appellate review of a ruling of a circuit court is limited to the very record there made and will not take into consideration any matter which is not a part of that record." *See also* Syl. pt. 4, *State v. Browning*, 199 W.Va. 417, 485 S.E.2d 1 (1997) ("This Court will not consider an error which is not properly preserved in the record nor apparent on the face of the record."); Syl. pt. 6, *State v. Byers*, 159 W.Va. 596, 224 S.E.2d 726 (1976). In this case, therefore, our review of the claimed error is limited to consideration of the evidence presented by defense counsel below.[12]

Note 9—Continued
made my ruling and let's get on with this at this point.

10. The defense remarked in its opening statement that there was not "a shred of physical evidence that any rape occurred." Likewise, Calloway's trial counsel began her closing argument by asserting: "First of all, there's no evidence whatsoever of a sexual assault."

11. Rule 103(a)(2) of the Rules of Evidence provides:

(a) *Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .

(2) *Offer of proof.*—In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

12. Calloway also presents a new theory of admissibility, one that differs substantially from what he argued before the trial court. In proceedings below, Calloway maintained that the DNA evidence was admissible for impeachment purposes. In the present appeal, however, he asserts that it was admissible for substantive purposes under the exception set forth in Rule 404(a)(3), which permits the introduction of evidence of a victim's prior sexual conduct with persons other than the defendant where such

"evidence is specifically related to the act or acts for which the defendant is charged and is necessary to prevent manifest injustice." Even if the proof offered by Calloway could be construed as substantive exculpatory evidence, our review would still be limited to determining whether the trial court erred in relation to the basis for admissibility advocated below. A party is required not only to present the substance of the proposed evidence, but must also state the purpose and theory justifying its admission. *See* W. Va. R.Crim. P. 51 (requiring that party make known to trial court "the action which that party desires the court to take ... *and the grounds therefore* ") (emphasis added); *see also* W. Va. R. Civ. P. 46 (same). Thus, as McCormick notes, "[i]f counsel specifies a purpose for which the proposed evidence is inadmissible and the judge excludes, counsel cannot complain of the ruling on appeal though it could have been admitted for another purpose." 1 Kenneth S. Braun, et al., *McCormick on Evidence* § 51, at 219 (John W. Strong ed., 5th ed.1999) (footnote omitted); *see United States v. Gaines*, 170 F.3d 72, 79 (1st Cir.1999) ("Grounds not identified at trial on which rejected evidence is admissible will ordinarily not provided a basis for reversal on appeal.") (citation omitted); *Huff v. White Motor Corp.*, 609 F.2d 286, 290 n. 2 (7th Cir.1979) (refusing to consider admissibility of evidence on grounds not advanced before trial court); *United States v. Lara–Hernandez*, 588 F.2d 272, 274 (9th Cir.1978) ("Absent plain error, a conviction will not be

On the record before us, we cannot conclude that the trial court abused its discretion in refusing to admit the proffered DNA evidence. The evidence was clearly within the purview of the Rape Shield Statute, since it was direct proof that the victim had previously engaged in sexual intercourse. While § 61–8B–11(b) expressly permits the introduction of evidence concerning a victim's past sexual history when the victim first makes his or her previous sexual conduct an issue in the trial, the victim's vague characterization of her relationship with an unidentified male friend in no way put her past sexual history at issue. We therefore find no error in the circuit court's application of the Rape Shield Statute to bar the introduction of the DNA evidence.

### B.

### *Constitutional Right to Present a Defense*

Calloway also contends that the trial court's ruling excluding the DNA evidence deprived him of his constitutional right to present a defense at trial.[13] He relies primarily on *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), which holds that courts may not mechanistically apply evidentiary rules so as to deny the admission of reliable and relevant evidence critical to an accused's defense. In line with this authority, we held in *State v. Jenkins*, 195 W.Va. 620, 466 S.E.2d 471 (1995), that "a trial judge may not make an evidentiary ruling which deprives a criminal defendant of certain rights, such as the right to examine witnesses against him or her, to offer testimony in support of his or her defense, and to be represented by counsel, which are essential for a fair trial pursuant to the due process clause found in the Fourteenth Amendment of the Constitution of the United States and article III, § 14 of the West Virginia Constitution." *Id.* at 628, 466 S.E.2d at 479.

reversed on evidentiary grounds not revealed to the trial court at the time of the assertedly erroneous ruling.")

**13.** Calloway relies upon the due process protections afforded by the Fifth and Fourteenth Amendments to the United States Constitution,

The United States Supreme Court has not as yet provided any clear rule for determining when the Constitution compels the admission of such evidence, although it has implied that a balancing of interests approach to each case should be used to reconcile the competing interests involved. *See Davis v. Alaska*, 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974). We adopted such an approach in syllabus point 6 of *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999), in the context of due process challenges to the exclusion of evidence under the Rape Shield Statute:

The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under this test, we will reverse a trial court's ruling only if there has been a clear abuse of discretion.

Applying this test to the present case, it is clear that while the evidence offered by the defense was conceivably relevant in the context of Calloway's theory at trial, it had little, if any, probative value. Again, there was no assertion at trial that the evidence in question was relevant for exculpatory purposes; rather, it was offered solely for impeachment purposes, to demonstrate a sexual relationship between the victim and her supposed boyfriend. In this vein, the DNA evidence was decidedly weak, since, as the trial court observed, the defense was unable to establish any reasonable link between the mattress stain and the individual who was alleged to have inflicted the victim's wounds.[14] Indeed, defense counsel made no

as well as the right to a fair trial found in Article III, § 14 of the West Virginia Constitution.

**14.** Defense counsel insisted at trial that the semen stain must have been the recent product of sexual relations between the victim and the supposed boyfriend, based upon the fact that the victim had only resided at the house for three

effort to even identify the boyfriend through its cross-examination of the victim. The trial court specifically found that the probative value of this evidence was outweighed by potential prejudice. Because the DNA evidence clearly would not have shed any significant light upon the issue for which it was offered, we see no reason to question this analysis. We therefore conclude that the excluded evidence was not constitutionally necessary for a fair trial.

## IV.

## CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

Justice SCOTT did not participate in the decision in this case.

Judge GARY L. JOHNSON, sitting by temporary assignment.

STARCHER, Chief Justice, concurring:

(Filed Jan. 6, 2000)

I write separately to emphasize the consistent recognition by this Court that a trial court must give a defendant in a rape case every fair opportunity to fight the charges against him. Rape shield laws cannot under any circumstances be applied in such a way as to deny a defendant the full constitutional right to confront his accuser.

Why is the constitutional right to present a full defense so important?

One reason is that the criminal trial process is far from perfect. Factually guilty people are sometimes not convicted of a crime they actually committed. And sometimes innocent people are convicted of crimes they did not commit. Just this year, a West Virginian who had been in prison for over 15 years on a rape charge was freed because of newly discovered DNA evidence.

In the instant case, the trial court's ruling applying the rape shield law did not injure the defendant's right to a full defense. (Nevertheless, if I had been the trial court, I probably would have let the semen stain evidence in.) Trial courts must hold the defendant's need and right to present a full defense as sacrosanct, and must resolve all doubts in favor of that right.

weeks prior to the assault. This was a spurious postulate, since there was no evidence suggesting that the mattress was new, and the victim had testified that she previously resided in an apartment.