566 S.E.2d 638

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Robert Dwayne COPEN, Defendant Below, Appellant.**

No. 29994.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 15, 2002.

Decided June 25, 2002.

Dissenting Opinion of Justice Starcher July 2, 2002.

502

Darrell V. McGraw, Jr., Attorney General, Allen H. Loughry, II, Senior Assistant Attorney General, Charleston, for Appellee.

Matthew A. Victor, Esq., Victor, Victor & Helgoe, LLP, Charleston, for Appellant.

PER CURIAM:

This is an appeal by Robert D. Copen from an order of the Circuit Court of Kanawha County sentencing him to life in the West Virginia Penitentiary without mercy for first degree murder. On appeal, the appellant claims that the trial court erred in admitting extremely gruesome and prejudicial pictures into evidence, that the court erred in failing to order a mistrial after the State made improper remarks during closing argument, and that the cumulative effect of various trial rulings by the court created an oppressive in-court atmosphere and deprived him of a fair and impartial trial.

## I.

### FACTS

The evidence adduced in this case shows that during the early morning hours of August 21, 1999, the appellant climbed to the roof of small shopping center in Belle, West Virginia, and shot Joan C. Moore, the proprietor of a beauty shop, as she was about to enter her car with the prior day's receipts. The rifle which the appellant used had a laser scope, and the appellant fired 11 shots, of which eight or nine struck Ms. Moore.

The gunshots attracted attention, and the police and an ambulance were summoned to the scene. Ms. Moore did not die immediately, and despite her wounds, she remained conscious and was able to identify the appellant, who had worked for her previously, as the individual who had shot her.

On the day following the shooting, the police arrested 14–year–old John "Grumpy" Harris, who admitted that he had conspired with the appellant to shoot and rob Ms. Moore. Later, the appellant was arrested and subsequently charged with homicide.

During the appellant's trial, extensive evidence regarding the shooting was introduced by the prosecution, including the testimony of John "Grumpy" Harris and the dying declaration of the victim. Mr. Harris testified that he and the appellant, in advance, planned to rob the victim. He further testified that during the robbery, the appellant shot the victim. The State also displayed to the jury various weapons which had been seized from the appellant, as well as various photographs of the body of Ms. Moore taken after her death. At points during the trial, the prosecutor used a laser pointer, similar to the laser sight on the rifle used by the appellant, to draw the jury's attention to certain evidence before it. Additionally, a medical examiner testified regarding the autopsy performed on Ms. Moore's body and used a generic diagram of a female body in discussing her wounds. The medical examiner used a laser pointer to point out the fatal wounds. The appellant made various objections during trial[1] to the admission of the dying statement of the victim, to the display of weapons other than the weapon actually used in the murder, to the use of the generic diagram of the female body by the medical examiner, and to the use of laser pointers. The court denied all of those objections. The court also denied an objection by the appellant to the accuracy of the portrayal of the crime scene on the date of the shooting and to the fact that at one point the victim's daughter was openly sobbing before the jury during the trial.

During the defense of the case, the appellant took the stand and admitted that he had fired shots in the direction of Ms. Moore on the evening of the crime charged. He, however, testified that he did not intend to shoot her, that he merely intended to scare her so that he could rob her. His specific testimony proceeded as follows:

Q. How were you going to rob her?

A. We were going to get on top of the building, shoot, she'd drop the money, get in the care [sic] and leave.

Q. You were going to fire your gun to scare her?

A. Yes, sir.

Q. After you came up with this plan, what did you do?

A. Went over to the corner of the Fas-Chek building. I started climbing up on top of it. Grumpy handed me the rifle. Then I had to help him up, because he was too short.

Q. Did you get on the roof?

A. Yes, sir.

1. We note that appellant is represented on appeal by different counsel than appeared at trial.

Q. Did she come out?

A. After about 15 minutes, she came out.

Q. What did you do?

A. I shot.

Q. Were you aiming at anything in particular?

A. The ground.

Q. Had you sighted in this gun or tested the laser sights in any way?

A. No, sir.

Q. When you fired, what happened?

A. She fell to the ground.

During closing argument, the prosecution, after the defense had raised the question in its own argument, discussed the possibility that the jury could find the appellant guilty of first degree murder with mercy or without mercy. The prosecutor argued that if the jury recommended mercy, the appellant would be eligible for parole and suggested that the members of the parole board, being "a bunch of political appointees," would likely turn the appellant loose. The appellant did not immediately object to the State's comments during closing argument and did not make a motion for mistrial at that time.

The next day, after the jury had retired to the jury room and had begun deliberations, the attorney for the appellant requested a mistrial based upon the prosecutor's remarks during closing argument. The court denied that motion, and the jury subsequently found the defendant guilty of first degree murder without a recommendation of mercy.

After the return of the verdict, the appellant made various post-trial motions, and those motions were denied by the trial court. Subsequently, on September 14, 2000, the trial court sentenced the appellant to life in the penitentiary without a recommendation of mercy.

## II.

### STANDARD OF REVIEW

■ In Syllabus Point 1 of *State v. Paynter*, 206 W.Va. 521, 526 S.E.2d 43 (1999), this Court stated:

"Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus point 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

The Court has also indicated that a circuit court's final order and ultimate disposition are reviewed under the abuse of discretion standard. *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997).

## III.

### DISCUSSION

■ One of the appellant's claims on appeal is that the trial court erred in allowing the State, during the development of its case, to introduce into evidence pictures of the body of the victim taken after the victim had died. The 16 pictures showed the body of the victim punctured at various points with gunshot wounds. On appeal, the appellant claims that the pictures were gruesome and that their nature rendered them highly prejudicial and that the prejudicial effect outweighed their probative value.

■ In *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994), this Court recognized that the admissibility of photographs, over an objection because of their gruesomeness, must be determined on a case-by-case basis, pursuant to Rules 401–403 of the West Virginia Rules of Evidence. Specifically, in Syllabus Point 10 of *State v. Derr, id.*, the Court stated:

Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be

overturned absence a showing of clear abuse.

During the trial, it was the position of the appellant that he was not attempting to shoot the victim when he fired at her. Instead, he claimed that he was simply trying to shoot at the ground to scare her. The challenged photographs, along with the testimony of the medical examiner, demonstrated that eight or nine of the 11 bullets fired by the appellant actually struck the victim's body.[2] The trial court examined the photographs and concluded that they were not gruesome. The court also examined the probative value of the photographs and concluded:

> [T]he photographs and each of the photographs are highly probative of the wounds, the nature of the wounds, and the location of the wounds suffered by the alleged victim in this case. They are also highly probative because they intend [sic] to either corroborate the testimony of other witnesses or evidence or potentially contradict the testimony or evidence of other witnesses.

The court found that the prejudicial effect of the admission of the photographs did not outweigh their probative value.

This Court has reviewed the photographs and has found that in most cases, they cannot be considered unduly gruesome. The photographs do portray the nude body of the victim. However, most of the photographs do not show particularly shocking wounds with detached or plainly revealed internal body parts, and most do not show badly torn flesh or even substantial amounts of blood. Instead, most show small red circles or spots where bullets entered the body. One photograph does appear to be relatively gruesome in that it shows, in somewhat high resolution, a gap in the victim's head where a bullet entered the victim's eye and exited through the victim's temple.

■ Even if the photographs could be considered to be gruesome, as indicated in *State v. Derr, id.*, gruesomeness alone does not justify the exclusion of the photographs from a trial. The exclusion is justified only if the prejudicial effect of the gruesomeness outweighs the probative value of the photographs. *State v. Derr, id.*

In examining the evidence in the present case, this Court, like the trial court, believes that the appellant later during the trial did interject an issue in the case as to whether he was actually attempting to shoot at the victim or shoot around her and simply frighten her. In effect, there was some question as to intent and malice, and intent and malice were plainly issues in the case when the photographs were offered into evidence. The fact that multiple shots were fired at the victim, so many in fact that they could not have been fired in an instant alone, coupled with the fact that the majority of bullets fired actually struck the body of the victim when the bullets were fired from a weapon with a sophisticated and accurate scope, would, in this Court's opinion, tend to be circumstantially probative of the fact that the appellant actually acted with intent and malice.

As indicated in Syllabus Point 10 of *State v. Derr, id.*, a trial court's exercise of discretion in ruling on the admission of potentially gruesome photographs should not be overturned by this Court absent a showing of clear abuse. After examining the photographs and the circumstances of the case, this Court cannot find such a showing of clear abuse.

■ Another of the appellant's claims is that the circuit court erred in failing to declare a mistrial when the prosecuting attorney made allegedly improper remarks to the jury. The remarks involved the possibility that the appellant would be released on parole.

In examining this issue, this Court notes that the appellant's own attorney raised the issue of, and discussed, the possibility of parole for the appellant during his closing argument sometime before the prosecutor made the remarks which the appellant claims were improper. For instance, at one point during closing argument, the appellant's at-

---

2. The medical examiner was unable to state conclusively whether eight or nine bullets actually struck the victim and caused the wounds examined during the autopsy. His evidence did show, however, that at least eight bullets struck the body.

torney referred to Sirhan Sirhan who was convicted of killing Robert Kennedy in 1968. The appellant's attorney stated:

> I give you an example, I heard on the news over the weekend, that Sirhan Sirhan, the fellow that killed one of the Kennedys, he's eligible for parole. If I remember right, that happened in, don't hold me to this, '68. He is eligible for parole and he is still locked up and matter of fact, his parole has been denied again, and he won't be considered again for another two years. That is how parole works.

In effect, defense counsel invited argument over the appellant's eligibility for parole.

During its own argument, the State did discuss the possibility that the appellant would be eligible for parole. Defense counsel did not, at that time, object or move for a mistrial. In fact, it appears that defense counsel moved for a mistrial on the day after the State's closing argument, and after the jury had retired to the jury room to deliberate.

This Court has indicated that the decision to declare a mistrial and discharge a jury is a matter within the sound discretion of the trial court. *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983). Further, the Court has indicated that: "In order to take advantage of remarks made during an opening statement or closing argument which are considered improper, an objection must be made and counsel must request the court to instruct the jury to disregard them." *State v. Coulter*, 169 W.Va. 526, 530, 288 S.E.2d 819, 821 (1982).

Because the appellant's attorney, in effect, invited argument relating to parole, and then failed to object in a timely fashion when the prosecution responded, this Court does not believe that the trial court abused its discretion in refusing to grant the appellant's motion for a mistrial relating to the point which was made after the jury had retired to deliberate.

■ The appellant also claims that the trial court made a number of erroneous evidentiary and trial rulings and that the cumulative effect of those rulings was to deny him a fair trial. For instance, he claims that the

trial court erred in admitting the victim's dying declaration. The trial court found that declaration was, in effect, an excited utterance. An excited utterance is admissible under Rule 803(2) of the West Virginia Rules of Evidence.

In Syllabus Point 1 of *State v. Harris*, 207 W.Va. 275, 531 S.E.2d 340 (2000), this Court examined what constitutes an excited utterance admissible under Rule 803(2) of the West Virginia Rules of Evidence. The syllabus point states:

> In order to qualify as an excited utterance under W.Va.R.Evid. 803(2):(1) the declarant must have experienced a startling event or condition; (2) the declarant must have reacted while under the stress or excitement of that event and not from reflection and fabrication; and (3) the statement must relate to the startling event or condition.

In the present case, this Court believes that the victim had experienced a startling event or condition since she had just been shot eight or nine times, and the Court also believes that her statement was made in reaction to the stress and excitement which she had received. Finally, the statement did relate to the startling event or condition the fact that she had been shot.

■ The principal content of the victim's dying declaration was that the appellant had been the individual who had shot her. Even if the admission of the statement had been improper, the Court fails to see its prejudicial effect in light of the fact that John "Grumpy" Harris, the appellant's accomplice, and the appellant, himself, testified that the appellant shot her.

■ The appellant also claims that the trial court erred in allowing the prosecution to use a laser pointer to point at evidence in the case including a diagram of the victim. The appellant suggests that the use of the laser pointer subliminally stressed the fact that the appellant might have used a sight on the murder weapon to shoot the victim. The trial court, in overruling the appellant's objections to the use of the laser pointer, stated:

> I don't see the potential for any harm at all or prejudice to your client because of the use of a laser pointer, especially when the

evidence is going to show precisely how the laser sight worked in this case. They're going to see whatever they're going to see, in any event. And if there's an impact, if there is, I would expect the impact to be from the demonstration of how the laser sight works.

While in certain situations, the Court can see that the use of a laser pointer might be prejudicial, the Court does not believe that is the situation here. The overwhelming evidence is that the appellant did, in fact, shoot the victim. The appellant's own testimony substantiates this fact, and it is hardly credible that the appellant would not have used the sight on the weapon when he shot it. Additionally, there was evidence as to how the laser sight functioned and evidence that eight or nine of the 11 bullets fired actually hit the body of the victim. Any subliminal suggestion which arose from the use of the laser pointer, in this Court's view, could, under the particular facts of this case, have had only an insignificant impact compared with the other evidence in the case.

 The appellant also contends that the trial court made various other improper evidentiary or trial rulings. In examining these rulings, the Court notes that in *State v. Calloway*, 207 W.Va. 43, 528 S.E.2d 490 (1999), this Court reiterated Syllabus Point 10 of *State v. Huffman*, 141 W.Va. 55, 87 S.E.2d 541 (1955), which stated: "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion."

 One of the appellant's evidentiary claims is that the trial court allowed the prosecution to display weapons which had nothing to do with the shooting. There was evidence that the weapons had been carried to the crime scene by the appellant on the night of the murder, and those weapons were linked to the appellant during and after the murder. This Court believes that the weapons were to a certain degree connected with the crime to show that the appellant had engaged in planning prior to the commission of the crime and that their admission into evidence was within the discretion of the trial court.

Similarly, the appellant claims that the trial court erred in inaccurately portraying the crime scene. The appellant's specific argument is that one photograph of the scene, a photograph of the roof of the victim's beauty salon, inaccurately portrayed the scene. The circuit court found that the admission of the photograph was proper and noted that the appellant would have an ample opportunity to cross-examine relating to the photograph and to point out any potential inaccuracies or inconsistencies, and, in fact, the appellant was afforded such an opportunity. Under these circumstances, the Court does not believe that the trial court abused its discretion in admitting the photograph.

 The appellant argues that the trial court erred in allowing the State to use a body diagram to show bullet holes where bullets entered the victim's body. The diagram, which was a generic body diagram, was used to point out the location of the entry and exist wounds produced by the bullets which entered the victim's body. The location of the wounds suggested the trajectory of the bullets which killed the victim, as well as the location of the perpetrator of the crime at the time of the shooting. The entry and exit locations were relevant and cannot see how the trial court abused its discretion in allowing the use of the diagram.

Another of the appellant's claims is that the trial court should have forced the victim's daughter to leave the courtroom after she became emotional. It does appear from the record that the daughter did, in fact, become emotional at one point, but she left the courtroom. It was only after she left the courtroom that the appellant requested that the court remove her, and the appellant did not subsequently make a motion for a mistrial relating to what had occurred.

Finally, the Court notes that the appellant contends that the error in the case was such that cumulatively it acted to deprive him of a fair trial.

The appellant's own testimony plainly shows that he shot the victim on the night of the crime charged. Other evidence in the case plainly shows that the victim died from the gunshot wounds which she sustained. Although the issue of intent was in question

in the case, in this Court's opinion, there was ample circumstantial evidence from which the jury could have inferred intent. As has previously been stated, the Court believes that various rulings which the appellant categorizes as being erroneous were within the trial court's discretion, and after considering the rulings cumulatively, in the context of the overall evidence in the case, the Court cannot conclude that there was cumulative error which would justify the reversal of the appellant's conviction.

For the reasons stated, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

STARCHER, Justice, dissenting.

(Filed July 2, 2002)

First, the photos of the victim that were offered into evidence by the prosecution in the instant case were gruesome and revolting and unnecessary in the prosecution of the case. They show a close-up of the disfigured face of the victim, and also show her nude body on a morgue slab, front and back. The photos had no independent evidentiary purpose, because there was no dispute whatsoever as to the location, number, and nature of the wounds on the victim's body. Of course, as psychological weaponry, the photographs were powerful. In such circumstances, nude photos of the dead victim's disfigured body can be counted on to inflame the jury's anger. Because the gruesome photographs could have tilted the jury on the mercy/no mercy issue, their admission was error and not harmless beyond a reasonable doubt.

Second, the State's expert witness used a laser pointer to point out wound locations on a chart of the victim's wounds. The defendant's counsel argued to the circuit court that the laser pointer was calculated to remind the jury of the fact that the defendant's gun had a "laser sight." The circuit judge said he thought it unlikely that the prosecution's use of laser pointers would send subliminal messages to the jury. To me, and I think to the average person, this possibility seems more than reasonable. More importantly, *there was no reason not to use a physical pointer,* as defense counsel suggested.

If the homicide in the instant case had been committed with a sword, would it have been proper to let the State's expert point out wound locations with a sword? I think not. The circuit judge's refusal to direct the prosecution to set their lasers aside in the instant case was error, and was not clearly harmless.

The prosecution's use of the gruesome photos, and insistence on using the laser pointer, were examples of prosecutorial overkill—which too often leads to tainted verdicts. In *State v. Guthrie,* 194 W.Va. 657, 685, 461 S.E.2d 163, 191 (1995), this Court stated that "only when there is a high probability that an error did not contribute to a criminal conviction" will we affirm a criminal conviction. *Id.* The evidence was overwhelming in support of a first-degree murder conviction in this case; and whether the defendant, a young man, should ever be eligible for parole, was the key issue at trial. There is no doubt in my mind that the gruesome photographs alone may have tipped the balance in the mercy/no mercy determination.

I would therefore reverse the conviction and remand for a new trial.

I am authorized to state that Justice AL-BRIGHT joins in this separate opinion.