## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs)  No. 16-0052** (Hampshire County 15-F-76)

**Mandy Lee O'Hara,**
**Defendant Below, Petitioner**

**FILED**

**June 9, 2017**

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Mandy Lee O'Hara, by counsel Jonathan G. Brill, appeals the Circuit Court of Hampshire County's December 21, 2015, amended sentencing order following petitioner's convictions for first-degree murder, conspiracy to commit murder, concealment of a deceased human body, conspiracy to conceal a deceased human body, burglary, and conspiracy to commit burglary. Based on the jury's recommendation that petitioner not receive mercy, the circuit court sentenced petitioner to life in prison without the possibility of parole for first-degree murder, and consecutive indeterminate prison terms for the remaining convictions. Respondent State of West Virginia, by counsel Benjamin F. Yancey, III, filed a response.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

### Factual and Procedural Background

In this appeal, petitioner challenges her convictions for first degree murder, conspiracy to commit murder, concealment of a deceased human body, conspiracy to conceal a deceased human body, burglary, and conspiracy to commit burglary. Petitioner was accused of conspiring with her boyfriend's adult son[1] to break into to the home of her estranged husband while he slept; stabbing the victim in the neck; killing him; placing the victim's body in a tarp; attaching the body in the tarp to their vehicle; and rolling the body into a river.

---

[1] The son of petitioner's boyfriend was indicted on the same charges as petitioner. He entered a plea agreement with the State that allowed him to plead guilty to second degree murder and be sentenced to ten to twenty years in prison in exchange for his testimony at petitioner's trial.

Petitioner was indicted in May of 2015, and the case proceeded to a jury trial over the course of four days in August of 2015. The evidence at the trial revealed the following: While she was married to the victim, petitioner began having an affair with another man, John Shoemaker II (hereinafter, "Mr. Shoemaker"). After the victim discovered the affair in March of 2013, petitioner moved out of her and the victim's residence and moved in with Mr. Shoemaker in Capon Bridge, West Virginia. At some point thereafter, Mr. Shoemaker's son, John Shoemaker III, (hereinafter, "co-defendant"), moved in with petitioner and his father.

In April of 2013, the victim filed for divorce from petitioner and sought custody of his and petitioner's biological sons. The family court ultimately awarded the victim primary custody of the boys and possession of the house that he previously shared with petitioner. The family court awarded petitioner limited visitation. The evidence revealed that the custody arrangement angered petitioner to the point that she talked about killing the victim with Mr. Shoemaker and the co-defendant.

Around 3:00 a.m. on the morning of September 26, 2013, petitioner woke the co-defendant and asked "if [he] was ready." Petitioner and the co-defendant drove to the victim's residence in the co-defendant's silver Chrysler PT Cruiser. During the ride, petitioner stated that she wanted custody of her kids and wanted the victim dead. Once at the victim's house, petitioner removed a screen from a window, opened the window, and entered the house. She then went to the front door and let the co-defendant into the house. Petitioner, armed with a knife, went to the victim's bedroom where he was sleeping, rolled him over, and a fight ensued. The victim grabbed petitioner's wrist and petitioner yelled for the co-defendant's assistance, at which point the co-defendant struck the victim in the face. The knife was thrown to the floor. After taking punches from the co-defendant and petitioner, the victim fell to the floor. At that point, the co-defendant pinned the victim to the floor and petitioner choked the victim until he passed out. Petitioner then told the co-defendant to go into the kitchen to retrieve another knife, which he did; however, petitioner located the original knife that was thrown to the floor and stabbed the victim twice in the neck, killing him.

At petitioner's direction, the co-defendant retrieved a tarp from the car. Petitioner and the co-defendant rolled the victim's body in the tarp and dragged the body out of the residence. Petitioner and the co-defendant then re-entered the house and attempted to clean the blood out of the hallway and bedroom. However, there was too much blood to clean, so petitioner retrieved a can of white paint, dumped the paint onto the remaining blood, and went back outside.

Once outside, petitioner and the co-defendant attached the victim's body in the tarp to the back of the PT Cruiser with a cable. The pair originally attempted to put the victim's body in his own car, but the victim's body was too heavy to lift and the co-defendant could not get the victim's car to start. Therefore, petitioner and the co-defendant drove away in the PT Cruiser toward the North River with the victim's body dragging behind them.

Around 5:00 a.m., Terry Swope and his wife were traveling in their vehicle when they came upon petitioner and the co-defendant in the PT Cruiser sitting in the road. After seeing Mr. Swope, petitioner backed her vehicle over the victim's body. Mr. Swope pulled over and saw the victim's body lying on the road behind the PT Cruiser. Mr. Swope and petitioner exited their

2

respective vehicles and petitioner told Mr. Swope that she had accidentally run over a person who had been lying on the road. Mr. Swope asked petitioner to call 911; however, petitioner claimed she did not have a cell phone. Mr. Swope returned to his vehicle to call 911, and petitioner went back to her vehicle. At that point, petitioner yelled for Mr. Swope to approach, claiming that the victim was still alive. Mr. Swope refused; instead, he got back into his vehicle and advised his wife to lock the doors. Petitioner and the co-defendant drove off, leaving the victim's body behind.

Shortly thereafter, petitioner and the co-defendant returned to where they left the body, but Mr. Swope was still there, so the pair sped off again. Mr. Swope followed them for about a mile before he stopped and again called 911. While waiting for the police, Mr. Swope saw petitioner and the co-defendant traveling past him in the direction of the victim's body. Petitioner and the co-defendant returned to the body a third time, reattached it to their vehicle, and drove to the North River. Petitioner pushed the victim's body into the river and then pulled it through the water to its final location underneath a tree. Petitioner and the co-defendant returned to their residence where they removed their blood and paint-stained clothes and placed them in petitioner's backpack.

Based on Mr. Swope's 911 calls, law enforcement went to the victim's residence and began their investigation. The officers also notified the victim's sister that the victim was missing. In response, the victim's sister informed the officers about the victim's divorce and custody dispute. The officers then went to petitioner's residence, where they arrested petitioner and the co-defendant. Law enforcement was also able to locate the victim's body by following blood and other markings caused by petitioner and the co-defendant's dragging of the victim's body.

Following a trial, the jury convicted petitioner of all six charges in the indictment. The jury did not recommend that petitioner receive mercy on the first degree murder conviction. The circuit court entered an amended sentencing order on December 21, 2015, in which the court sentenced petitioner to life in prison without the possibility for parole for first degree murder; one to five years in prison for conspiracy to commit murder; one to five years for concealment of a deceased human body; one to five years for conspiracy to conceal a deceased human body; one to fifteen years for burglary; and one to five years for conspiracy to commit burglary. The circuit court ordered the sentences to run consecutively. Petitioner now appeals to this Court.

## Discussion

On appeal, petitioner raises the following four assignments of error: (1) the circuit court abused its discretion in giving a flight instruction to the jury because the State failed to present sufficient evidence that petitioner had taken flight; (2) the circuit court abused its discretion in failing to declare a mistrial when the State elicited prejudicial testimony regarding graphic, sexual content of letters located at the crime scene; (3) the circuit court abused its discretion in admitting prejudicial, irrelevant, and cumulative photographs; and (4) the circuit court abused its discretion in admitting incriminating letters purportedly written by petitioner without proper authentication by the State. We address petitioner's arguments in turn.

3

## I. Jury instruction on flight

Petitioner's first assignment of error is that the circuit court should not have given a flight instruction to the jury. Petitioner argues that the instruction was not warranted because the State introduced insufficient evidence that she fled. We have held that "[w]hether facts are sufficient to justify the delivery of a particular instruction is reviewed by this Court under an abuse of discretion standard. In criminal cases where a conviction results, the evidence and any reasonable inferences are considered in the light most favorable to the prosecution." Syl. Pt. 12, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). Additionally, "[a]n instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it." Syl. Pt. 8, *State v. Hall*, 171 W. Va. 212, 298 S.E.2d 246 (1982).

Our law governing the admission of flight evidence is well-settled. This Court has held as follows:

> In certain circumstances evidence of the flight of the defendant will be admissible in a criminal trial as evidence of the defendant's guilty conscience or knowledge. Prior to admitting such evidence, however, the trial judge, upon request by either the State or the defendant, should hold an *in camera* hearing to determine whether the probative value of such evidence outweighs its possible prejudicial effect.

Syl. Pt. 6, *State v. Payne*, 167 W. Va. 252, 280 S.E.2d 72 (1981). We further stated that

> [i]n considering whether the facts and circumstances of the case indicate a guilty conscience or knowledge, the trial judge should consider whether the defendant was aware of the charges pending against him at the time he fled; was aware that he was a suspect at the time he fled; or fled the scene of a crime under circumstances that would indicate a guilty conscience or knowledge; or otherwise fled under circumstances such that would indicate a desire to escape or avoid prosecution due to a guilty conscience or knowledge.

*Id.* at 267, 280 S.E.2d at 81.

In the present case, consistent with *Payne*, the circuit court held an in camera hearing regarding the flight evidence at issue. At the hearing, Mr. Swope testified consistent with his trial testimony that he and his wife encountered petitioner and the co-defendant stopped in the roadway; that petitioner stated she accidentally hit a person who was lying on the road; that he called 911 after petitioner claimed she did not have a cell phone; that petitioner claimed the victim was still alive in an attempt to make Mr. Swope approach her; that, when he refused to approach petitioner, she sped off; that petitioner returned shortly thereafter and stopped behind his vehicle; that petitioner sped off a second time; that he followed her, but ended the pursuit when his wife begged him to do so; and, that after ending his pursuit, he saw petitioner return to the location of the victim's body. Petitioner did not testify at the in camera hearing. The circuit court found that there was sufficient evidence to warrant a flight instruction. In its final charge to the jury, the circuit court instructed the jury as follows:

4

Evidence of flight by the Defendant is competent, along with other facts and circumstances of the Defendant's guilt, but the jury should consider any evidence of flight with caution since such evidence has only a slight tendency to prove guilt. The farther away the flight is from the time of the alleged commission of the offense the less weight it will be entitled to, and the circumstances should be cautiously considered since flight may be attributed to a number of reasons other than consciousness of guilt.

Petitioner does not challenge the admission of Mr. Swope's trial testimony, which mirrors his testimony at the in camera hearing. Instead, she contends that the evidence does not demonstrate that she fled the scene of a crime. Petitioner contends the instruction was not warranted because, each time she left the scene where she encountered Mr. Swope and where the victim's body lay, she returned. However, we do not find that the circuit court abused its discretion in giving the instruction because the crucial and undisputed fact is that petitioner fled the location in the first place; it matters not to the analysis that she ultimately returned. As the circuit court properly noted, petitioner's leaving of the scene "shows guilty conscience and knowledge that [she] had done something wrong," i.e., she murdered her estranged husband. As the State argues, the murder and the concealment of the victim's body are "inextricably connected to one another." Therefore, because the record shows that petitioner left the scene in an effort to avoid capture, and that she returned to the scene to continue her efforts to conceal the body, we find the circuit court did not abuse its discretion in giving a flight instruction to the jury.

## II. Testimony regarding the content of letters found at the crime scene

In her second assignment of error, petitioner argues that the circuit court abused its discretion by failing to declare a mistrial after an investigating officer testified to graphic, sexual letters found at the murder scene. By way of background, during the search of the victim's home, law enforcement found a bloody glove, a bloody knife, and various letters in a trash can. The letters in question were addressed to petitioner and sent from a Nathan Messick, an inmate in federal prison in South Carolina. In the letters, Mr. Messick wrote that he believed the victim was not satisfying petitioner sexually, and described in graphic detail the sexual acts he intended to perform upon her once he was released.

As a result of the sexual nature of the letters, petitioner moved the circuit court prior to trial to exclude their content as being prejudicial and irrelevant. At a pre-trial hearing, the circuit court ruled that the State could only refer to the content of the letters as indicating a "potentially romantic relationship between [petitioner] and Mr. Messick." Investigating Officer Captain John Eckerson was the State's first witness at trial. When asked to describe the content of the letters he found at the scene, he testified that the letters were "gushy, pen pal, prison letters." When asked a follow-up question as to whether the letters indicated a romantic interest between petitioner and Mr. Messick, Captain Eckerson testified, "Yeah. There was some graphic sexual stuff in it, yes." Captain Eckerson's answer prompted petitioner to move for a mistrial, which the circuit court denied on the grounds that the testimony was not prejudicial.

5

On appeal, petitioner contends that Captain Eckerson's testimony warranted a mistrial. We review this issue under an abuse of discretion standard.

> The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. A trial court is empowered to exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict. This power of the trial court must be exercised wisely; absent the existence of manifest necessity, a trial court's discharge of the jury without rendering a verdict has the effect of an acquittal of the accused and gives rise to a plea of double jeopardy.

*State v. Lowery*, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008) (citing *State v. Williams*, 172 W. Va. 295, 304, 305 S.E.2d 251, 260 (1983) (citations omitted)).

Upon our review of the record and the parties' arguments, we find that the circuit court did not abuse its discretion in denying petitioner's motion for a mistrial. Petitioner states that the letters played significant role in explaining what she describes as a "domestic struggle" on the night of the murder. However, petitioner contends that Captain Eckerson's testimony was prejudicial because it "may have lead [sic] the jury to believe that [she] had no regard for her marriage. And based upon the disregard for her marriage, the jury may be left to infer that [petitioner] may have been more likely to commit the intentional murder of her husband." This argument rings hollow. Even if Captain Eckerson had described the letters as indicating a "potentially romantic relationship between [petitioner] and Mr. Messick," petitioner fails to recognize that there was ample other evidence from which the jury could infer that she had little regard for her marriage, to wit: that she was living with Mr. Shoemaker, with whom she was having an affair at the time of the murder.

More importantly, the basis of the circuit court's pre-trial ruling was to prohibit admission of the graphic, sexual *content* of the letters. Although Captain Eckerson's testimony went beyond the precise description of the letters that the circuit court authorized, his testimony in no way revealed any of the graphic, sexual content in the letters, and thus, was not unduly prejudicial to petitioner. Accordingly, the circuit court correctly denied petitioner's motion for a mistrial. Accordingly, we find her second assignment of error is without merit.

### III. Admission of photographs

Petitioner's third assignment of error is that the circuit court abused its discretion in admitting (1) certain photographs the victim's body in the river, and (2) photographs of the home in which petitioner was living at the time of the murder. We have long held as follows with respect to the admission of photographic evidence:

> In general, photographs of victims are admissible if they are relevant. . . . If the photographs offered are gruesome or revolting, however, they will not be admitted unless the State shows that they are of essential evidentiary value to its case. *State v. Rowe,* 163 W.Va. 593, 595–96, 259 S.E.2d 26, 28 (1979). The admission of photographs rests in the sound discretion of the trial court, and its

rulings will be upheld unless there is a clear showing of abuse of discretion. *State v. Wooldridge,* 129 W.Va. 448, 464, 40 S.E.2d 899, 908 (1946).

*State v. Trail*, 174 W. Va. 656, 660, 328 S.E.2d 671, 675 (1985). Additionally,

> "Rule 401 of the West Virginia Rules of Evidence requires the trial court to determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case. The trial court then must consider whether the probative value of the exhibit is substantially outweighed by the counterfactors listed in Rule 403 of the West Virginia Rules of Evidence. As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." Syllabus point 10, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994).

Syl. Pt. 6, *State v. Berry*, 227 W. Va. 221, 222–23, 707 S.E.2d 831, 832–33 (2011).

First, petitioner challenges the admission of three photographs of the victim labeled #11, #12, and #13. Photo #11 depicted the victim's neck, which was partially underwater and leaking blood from stab wounds. Photo #12 depicted the victim's body as it lay in the river. The photo shows that the body was draped in a blue tarp that was encircled with twine and metal cable. Photo #13 depicted a close-up view of the victim's ankle and foot wrapped in twine and cable. Petitioner contends that these photographs were inflammatory, that they were cumulative due to two other photographs that depicted the body in the river and the victim's wounds, and that their probative value is minimal because the location and position of the victim's body was sufficiently established by witnesses.

Upon our review, we find no abuse of discretion in the admission of these three photographs. The photographs merely corroborated the trial testimony as to the location and condition of the body. As the State argues, the photographs gave the jury a visual account of how the victim had been stabbed, covered with a tarp, bound, attached to petitioner's car, dragged, and then rolled into the North River. Any prejudicial effect of the photographs is outweighed by their probative value.

Petitioner also challenges the admission of four photographs that depicted the interior of the trailer she shared with Mr. Shoemaker, the co-defendant, and several children. Petitioner claims that the photographs were prejudicial because they depict the home as filthy and in a state of disarray. The purpose of the photographs was to corroborate witness testimony that, due to the small size of the rooms, petitioner could be overheard talking about killing the victim. In this respect, the photographs were highly probative and properly admitted. Therefore, we reject petitioner's third assignment of error.

#### IV. Admission of letters written by petitioner

In her final assignment of error, petitioner argues that the circuit court abused its discretion by admitting four handwritten letters that petitioner purportedly wrote to Mr.

Shoemaker while she was at the Potomac Highlands Regional Jail awaiting trial. Petitioner contends that the State failed to properly authenticate the letters as being written by petitioner because Mr. Shoemaker testified that he recognized petitioner's handwriting, but that had "just seen her sign her name and stuff like that."

In the letters, which petitioner asked Mr. Shoemaker to give to his son (the co-defendant), petitioner (1) describes her and the co-defendant's involvement in the crimes; (2) tells the co-defendant what to say to law enforcement; (3) details she had an argument with the victim that escalated into a physical fight with both of them wielding knives; and (4) admits she alone killed the victim and that the co-defendant was not present at the time. Mr. Shoemaker did not give the letters to the co-defendant; instead, he had his girlfriend turn the letters over to law enforcement. The State introduced the letters through the testimony of Mr. Shoemaker, over petitioner's objection.

We have held as follows:

> In an analysis under *W.Va.R.Evid.* 901 a trial judge must find that the party offering the evidence has made a *prima facie* showing that there is sufficient evidence "to support a finding that the matter in question is what its proponent claims." In other words, the trial judge is required only to find that a reasonable juror could find in favor of authenticity or identification before the evidence is admitted. The trier of fact determines whether the evidence is credible. Furthermore, a trial judge's ruling on authenticity will not be disturbed on appeal unless there has been an abuse of discretion.

Syl. Pt. 1, in part, *State v. Jenkins*, 195 W. Va. 620, 466 S.E.2d 471 (1995). Additionally,

> When the contents of a letter are of such nature that the letter could not have passed between any parties except the purported writer and the person to whom it was delivered, the letter is admissible in evidence under the rule that the authenticity or the genuineness of a letter must be established by proof of the handwriting of the author or by other proof of its genuineness.

Syl. Pt. 6, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994).

In the present case, Mr. Shoemaker identified petitioner's handwriting as he was familiar with it; identified petitioner's signature; identified that the letters were dated in October of 2013, when petitioner was incarcerated at the Potomac Highlands Regional Jail; identified that the letters were sent from Potomac Highlands Regional Jail; and identified that the letters were addressed to his mother's residence where he was living at the time. This testimony provided sufficient evidence to authenticate the letters in question. However, even if the testimony had not provided sufficient evidence, pursuant to *Jenkins,* the jury remained empowered to reject this testimony if it did not find it credible. Accordingly, we reject petitioner's final assignment of error.

## Conclusion

For the foregoing reasons, we affirm the Circuit Court of Hampshire County's December 21, 2015, amended sentencing order.

Affirmed.

**ISSUED:** June 9, 2017

**CONCURRED IN BY:**

Chief Justice Allen H. Loughry II
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Elizabeth D. Walker

9