**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

State of West Virginia,
Plaintiff Below, Respondent

**v.)  No. 23-5** (Raleigh County CC-41-2021-F-235)

Rashad Akheem Thompson,
Defendant Below, Petitioner

## MEMORANDUM DECISION

Petitioner Rashad Akheem Thompson appeals the Circuit Court of Raleigh County's December 16, 2022, sentencing order following his convictions for one count each of first-degree murder, attempted first-degree murder, malicious assault, and child abuse resulting in death, and for two counts of domestic battery.[1] The petitioner claims that the circuit court admitted irrelevant and unfairly prejudicial gruesome and duplicative photographs of the murder victim and erroneously limited the petitioner's ability to "present[] a complete defense." Upon our review, finding no substantial question of law and no prejudicial error, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

On March 18, 2021, Beckley Police Department officers were dispatched to an apartment following receipt of a 9-1-1 call reporting a stabbing. Next door to the apartment at which the stabbing reportedly occurred, officers discovered F.B. bleeding from her face. F.B. reported that she had been stabbed by her boyfriend, the petitioner, and she told officers that her seven-year-old child, T.B., was still in the apartment she shared with the petitioner. Officers proceeded to that home, found the petitioner and the floor inside covered in what appeared to be blood, and discovered a deceased child with significant trauma to his head. A hammer, also covered in what appeared to be blood, was laid nearby.

In May 2021 the petitioner was indicted for the first-degree murder of T.B., attempted first-degree murder of F.B., malicious assault of F.B., and child abuse resulting in T.B.'s death. He was also indicted on two counts of domestic battery, one count pertaining to F.B. and the other to T.B.

At a pretrial conference, the petitioner moved to exclude four photographs of T.B.'s head that he argued were gruesome, duplicative, and unfairly prejudicial. The circuit court

---

[1] The petitioner appears by counsel Matthew A. Victor. The State appears by Attorney General Patrick Morrisey and Deputy Attorney General Andrea Nease Proper. We note that initials are used where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

1

acknowledged that the photographs were "disturbing," but it also found that they showed "some element or some measure o[f] severity" and, therefore, "would be necessary to prove deliberate intent, and perhaps premeditation." It further found that the probative value outweighed the prejudicial effect, remarking that the photographs "are not so severe that we would have difficulties in that concern." The court also found that they were not duplicative "in any great measure," as they depicted "different angles, different aspects." Accordingly, the court denied the petitioner's motion.

Also at the pretrial conference, the court considered the State's motion to exclude evidence of the victims' "character or reputation or prior conduct." By counsel, the petitioner "objected," arguing that, based on his investigation, F.B. killed T.B. The petitioner explained that F.B. either had killed or was in the process of killing T.B., the petitioner tried to stop her, and this led to the altercation between the petitioner and F.B. He claimed to have "extensive testimony" concerning F.B.'s alleged "history of verbal degrading and violence involving this child who was [a]utistic and was very, very difficult to take care of." The petitioner also asserted that F.B. had been "drinking heavily" on the day of T.B.'s murder. "Essentially," the petitioner summarized, F.B. "was on her last thread and her patience was gone." The petitioner identified two of the petitioner's neighbors by name who would purportedly offer this testimony, and he referred to "another neighbor" whom the defense "intend[ed] to talk with." The petitioner asserted that the evidence was not improper character evidence, as the State contended, "if it show[ed] a pattern of behavior leading up to the killing of this child and a reason for a motive and opportunity, if she has a violent temper, if she has verbally and possibly physically abused this child in public, as witnessed by neighbors." The petitioner further argued that testimony would demonstrate that F.B. had the character, temperament and predisposition to kill T.B. The State denied "know[ing] what the evidence is, even," but argued that the petitioner's anticipated evidence "would be conjecture, speculative, and otherwise violative of the rules of evidence." The court agreed with the State and declined to allow evidence that F.B. "had the propensity toward violence, that she was violent towards this child based upon habit or her prior actions," finding such evidence to be "entirely improper." But the court did allow the petitioner to show, "assuming [he had] some direct testimony or evidence," that F.B., at the time of the incident, had been drinking and that she had been yelling at T.B. The petitioner asked that the court expand its ruling beyond the time of the incident to include what happened earlier in the day. The court ruled, "If it's facts, I'll allow it."

The petitioner proceeded to a jury trial in October 2022. F.B. testified that the petitioner returned to their home at approximately 11:00 p.m. on March 17, 2021. The two ate dinner and drank alcohol together, and then an argument developed during the early morning hours of March 18, 2021, that got "very heated." The petitioner reportedly "grabbed [F.B.] from behind and choked [her] so hard that [the] kitchen chair snapped in two." F.B. said that the petitioner then retrieved a knife from a kitchen drawer, sat at the kitchen table, and called his mother to tell her he loved her. After calling his mother, the petitioner "swirled the knife on the table, staring at [F.B.] telling [her], 'B-i-t-c-h, you're going to die tonight. You won't make it out of this kitchen alive." F.B. testified that the petitioner then stabbed her in her stomach and chest, and she briefly lost consciousness. When she came to, she recalled him "on top of [her] stabbing [her] repeatedly, over and over and over, very violently." F.B. testified that she kicked the petitioner as hard as she could, ran to Rose Scalf's apartment next door, and "screamed" for Ms. Scalf and her son to call 9-1-1 and to get

F.B.'s children from the home. F.B. recalled that Ms. Scalf retrieved her two-year-old daughter.[2] Ms. Scalf ran back for T.B. and "gasped" but "would not tell" F.B. what she had seen. F.B. identified the petitioner as her attacker.

During his extensive cross-examination of F.B., the petitioner's questions emphasized the fact that F.B. had been drinking on the night in question, inquired into the amount of alcohol she consumed, highlighted discrepancies between her statement to law enforcement and trial testimony, confirmed that she did not "try and rescue" her children before running to Ms. Scalf's home, and probed into why T.B.'s blood and her own are on an article of clothing collected in evidence. The petitioner also sought (but did not obtain) admissions from F.B. that T.B. was dead when she left the apartment, that she and the petitioner argued due to F.B.'s attack of the petitioner, and that F.B. attacked T.B. on the night in question.

Ms. Scalf testified that when F.B. was banging on her front door—her face "covered in blood"—F.B. said, "He's stabbing me." After Ms. Scalf brought the petitioner and F.B.'s daughter to her home, Ms. Scalf returned for T.B. She testified that the lights were off in the petitioner and F.B.'s apartment, so she turned on a flashlight and saw the petitioner "standing there and he was just like making the motion," which she described as a "down motion." Ms. Scalf could not see T.B., but she could hear "a sound like, if you take a belt and . . . hit a leather couch or something . . . . And it kind of sounded like gushy, maybe." Ms. Scalf "just stood there for a second" and then returned to her apartment because she "didn't know—really know what was going on." The petitioner's cross-examination of Ms. Scalf highlighted that she "could smell alcohol" on F.B., and the petitioner asked whether F.B. had an "explosive temper," which Ms. Scalf denied.

Lieutenant Matt Price, an officer with the Raleigh County Sheriff's Department and one of the first responders, testified that when he first saw the petitioner, he "was covered from head to toe, in his hair, in his beard, on his chest, covered in blood and gore." Lieutenant Price also noted "copious amounts of blood and material, brain matter strewn everywhere" in the apartment the petitioner and F.B. shared. When Detective Bragg, the chief of detectives for the Beckley Police Department, arrived at the scene, he noticed a hammer laying near the front door of the apartment and "the deceased child on the couch." Detective Bragg further "noted an extreme amount of blood throughout the residence, what we would term to be castoff or blood splatter across the ceilings and walls. I noted a large amount of blood in the kitchen area. It appeared to me, that a struggle of some sort had occurred." Detective Bragg took photographs of the petitioner, including "what appeared to be blood and biological material on his skin," and the detective took swab samplings of the petitioner's face and hands. Detective Bragg attempted to photograph any injuries to the petitioner, but the petitioner advised that he had no injuries. Corporal William Gravely, of the Beckley Police Department, asked the petitioner what happened, and he testified that the petitioner answered, "I lost it." Ms. Scalf also testified to overhearing the petitioner make this statement.

Swabs of the petitioner's hands and face were submitted for DNA testing. T.B. and F.B. "could not be excluded as possible contributors to the primary mixture of DNA" found on the petitioner's right hand, and the "primary results" of the DNA found on the petitioner's face were

---

[2] The petitioner and F.B. are the parents of the two-year-old daughter. The petitioner is not T.B.'s father.

"consistent with the DNA profile of [T.B.]." A white shirt found at the scene—matching the description of the one worn by the petitioner on the night of the attacks—contained DNA matching the profiles of T.B. and F.B.[3]

During the petitioner's case-in-chief, he presented numerous witnesses who testified, generally, to his strong work ethic and nonviolent, peaceful nature. His witnesses denied seeing him physically or verbally abuse his own children or any other child, and several testified to being shocked by the charges the petitioner faced. Ashley Mullins, another neighbor who lived in the same apartment complex as the petitioner and F.B., testified that Ms. Scalf "swore [to her that F.B.] had to have something to do with this, that it could not have been just him." But Ms. Mullins said that this was based only on a "feeling" due to the fact that everyone generally liked the petitioner. Ms. Mullins denied that Ms. Scalf ever told Ms. Mullins that "she saw [F.B.] do something to [T.B.] . . . [o]n that day . . . [or] pertaining to this incident."

During the petitioner's closing, his counsel argued that F.B. had been "drinking a long time" before T.B.'s murder and getting increasingly angry. The petitioner posited that, after the petitioner returned home from work, F.B. revealed to the petitioner that she had "taken care of it" and murdered T.B. Further advancing the petitioner's version of events, the petitioner argued that, upon seeing the murdered child, he "loses it" and, "[f]or the first time in his life," he "explodes in anger" and the altercation with F.B. ensued.

Following its deliberations, the jury found the petitioner guilty of each count charged in the indictment. In a bifurcated proceeding, the jury recommended mercy for his first-degree murder conviction. The circuit court sentenced the petitioner to incarceration for life, with mercy, for his first-degree murder conviction; not less than three nor more than fifteen years for his attempted first-degree murder conviction; not less than two nor more than ten years for his malicious assault conviction; and fifteen years to life for his child abuse resulting in death conviction. The court also sentenced the petitioner to determinate terms of one year in jail for each domestic battery conviction. The court ordered that the petitioner's sentences for first-degree murder, attempted first-degree murder, malicious wounding, and child abuse resulting in death be served consecutively to one another and that his sentences for domestic battery be served concurrently with one another and with the sentences for his remaining convictions. The petitioner now appeals from the court's December 16, 2022, order memorializing that sentence.

In the petitioner's first assignment of error, he argues that the circuit court erred in admitting the duplicative and "gruesome" close-up photographs of T.B.'s head. The petitioner contends that the testimony from the officers who assessed the scene and from the medical examiner proved the child's death and method of killing, so the photographs had no evidentiary value and served only to inflame the jury's passions. Further, because other pictures depicted the child and the violent death he suffered, the close-up photographs were unnecessary, and whatever probative value the close-up photographs held was outweighed by their undue prejudice.

---

[3] Other witnesses for the State included the surgeon who treated F.B. on the night of her attack, an emergency medical technician who responded to the scene of the crimes, other law enforcement officers involved in the investigation of the crimes, and the medical examiner who performed T.B.'s autopsy.

"The admissibility of photographs over a gruesome objection must be determined on a case-by-case basis pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence." Syl. Pt. 8, *State v. Derr*, 192 W. Va. 165, 451 S.E.2d 731 (1994). Under Rule 401, the circuit court is required to "determine the relevancy of the exhibit on the basis of whether the photograph is probative as to a fact of consequence in the case." *Derr*, 192 W. Va. at 168, 451 S.E.2d at 734, Syl. Pt. 10, in part. The court "then must consider whether the probative value of the exhibit is substantially outweighed by," among other things, "unfair prejudice . . . or needlessly presenting cumulative evidence." *Id.* (citing W. Va. R. Evid. 403). "As to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse." *Derr*, 192 W. Va. at 168, 451 S.E.2d at 734, Syl. Pt. 10, in part; *see also State v. Copen*, 211 W. Va. 501, 505, 566 S.E.2d 638, 642 (2002) ("[A] trial court's exercise of discretion in ruling on the admission of potentially gruesome photographs should not be overturned by this Court absent a showing of clear abuse.").

As "murder in the first degree consists of an intentional, deliberate, and premeditated killing," the circuit court did not err in identifying intent, deliberation, and premeditation as facts of consequence to the petitioner's first-degree murder charge. Syl. Pt. 5, in part, *State v. Zuccaro*, 239 W. Va. 128, 799 S.E.2d 559 (2017). The court also did not err in determining that the photographs were probative as to those elements. The challenged photographs depict the petitioner's focused strike(s) to T.B.'s head, evidencing his intent and determination to kill the child. *See State v. White*, 231 W. Va. 270, 284, 744 S.E.2d 668, 682 (2013) (quoting *State v. Guthrie*, 194 W. Va. 657, 675, 461 S.E.2d 163, 181 (1995) ("As for premeditation and deliberation, 'there must be some evidence that the defendant considered and weighed his decision to kill.'"); *see also State v. Grantham*, No. 12-1293, 2013 WL 6152080, *5 (W. Va. Nov. 22, 2013) (memorandum decision) (finding no error in the admission of photographs "showing bowels protruding from" the victim's body because "[t]he severity of the victim's abdominal injury showed that the stabbing was intentional and inflicted with malice."). Further, the court did not err in concluding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice due to our prior recognition that "[g]ruesome photographs simply do not have the prejudicial impact on jurors as once believed by most courts." *Derr*, 192 W. Va. at 177 n.12, 451 S.E.2d at 743 n.12. Instead, "[t]he average juror is well able to stomach the unpleasantness of exposure to the facts of a murder without being unduly influenced. . . . [G]ruesome or inflammatory pictures exist[] more in the imagination of judges and lawyers than in reality." *Id.* (quoting *People v. Long*, 113 Cal. Rptr. 530, 537 (Cal. Ct. App. 1974)). Likewise, the court did not err in concluding that the probative value was not substantially outweighed by the danger of needlessly presenting cumulative evidence where the photographs showed different views. Accordingly, the court did not clearly abuse its discretion in admitting the challenged photographs.

In the petitioner's second and final assignment of error, he argues that the circuit court deprived him of the right to offer testimony in support of his defense, namely his theory of an alternative assailant. The petitioner argues that he needed to present testimony addressing F.B.'s alleged prior abusive actions toward T.B., tendency to become intoxicated, tendency to become

5

violent when drunk, and lack of patience with T.B.[4] He contends that there was no "compelling State's interest" in the court's exclusion of that evidence.

Our review of the circuit court's evidentiary ruling is for an abuse of discretion. Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998). Preliminarily, we reject the petitioner's characterization of the court's ruling as depriving him of the ability to present his defense. The court explicitly permitted the petitioner to present evidence of F.B.'s intoxication and conduct toward T.B. on the day of his murder. The petitioner questioned witnesses accordingly and argued his defense in closing. That the petitioner's evidence and argument did not, ultimately, convince the jury of his version of the facts does not equate to a deprivation of the right to present his version of the facts. Regarding the petitioner's inability to go further than this, we have held that "[f]or evidence of the guilt of someone other than the accused to be admissible, it must tend to demonstrate that the guilt of the other party is inconsistent with that of the defendant." Syl. Pt. 5, *State v. Frasher*, 164 W. Va. 572, 265 S.E.2d 43 (1980), *overruled on other grounds by Guthrie*, 194 W. Va. at 668, 461 S.E.2d at 174. In addition, the admissibility of such testimony

> hinges on a determination of whether the testimony tends to directly link such person to the crime, or whether it is instead purely speculative. Consequently, where the testimony is merely that another person had a motive or opportunity or prior record of criminal behavior, the inference is too slight to be probative, and the evidence is therefore inadmissible.

Syl. Pt. 1, in part, *State v. Harman*, 165 W. Va. 494, 270 S.E.2d 146 (1980). By the petitioner's own admission at the pretrial conference, the testimony he sought to elicit would demonstrate only F.B.'s alleged motive and opportunity to harm T.B., not any direct link between F.B. and the crimes against T.B. Moreover, the petitioner was covered in T.B.'s blood and biological matter. Ms. Scalf saw the petitioner moving in ways that were consistent with the manner in which T.B. was murdered, and the sounds she described hearing while the petitioner made those "down motion[s]" provided further corroboration of the petitioner's involvement in T.B.'s murder. When asked what happened, the petitioner admitted that he "lost it." The testimony that the petitioner sought to elicit would not demonstrate F.B.'s guilt at all, let alone guilt inconsistent with the petitioner's own. As a result, the circuit court correctly deemed the testimony/evidence inadmissible.[5]

---

[4] To date, the petitioner has not described with specificity what this evidence is or who could testify to it.

[5] Although the petitioner does not specifically invoke Rule 404(b) of the West Virginia Rules of Evidence, to the extent he sought to admit evidence of F.B.'s alleged wrongs or other acts to prove "motive, opportunity, [or] intent" as contemplated by that rule, we find no error in the circuit court's exclusion of the proffered evidence because it involved speculative, irrelevant, collateral conduct that would have confused the jury and wasted judicial time and resources. *See, e.g.*, *Zuccaro*, 239 W. Va. at 144, 799 S.E.2d at 575 (involving defendant's proffer of 404(b) evidence pertaining to victim's prior bad acts and finding no error in the trial court's exclusion of speculative evidence where there was "nothing to connect" the crimes to the "proffered prior bad acts").

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** August 27, 2024

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn